UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ICOA, INC., *Plaintiff,* | : | |
| vs. | : | C.A. No. 07-069 S |
| KEVIN QUAINTANCE, *Defendant*. | : | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER**

Plaintiff, ICOA, INC. ("ICOA") submits the following Memorandum in support of its Motion for a Temporary Restraining Order to temporarily:

> (1) restrain and enjoin defendant, KEVIN QUAINTANCE ("Quaintance"), from: (a) continuing to exercise purported ownership rights and/or control over the following four domain names: (i) www.airportnetworksolutions.com; (ii) www.airportwins.com; (iii) www.authdirect.com; and/or (iv) www.authdirect.net (the "Domain Names"); and/or (b) accessing ICOA's so-called AuthDirect/Tollboth system, or any other proprietary software or systems owned by ICOA, or any subsidiary of ICOA's;
>
> (2) transfer all rights to the Domain Names to ICOA;
>
> (3) compel Quaintance to cooperate forthwith with ICOA's efforts to transfer registration of the Domain Names in its name from eNOM, Inc. to Network Solutions, Inc.; and
>
> (4) stay the American Arbitration Association proceeding commenced by Quaintance on or about February 1, 2007 entitled *Kevin Quaintance v. Erwin Vahlsing/ICOA Corporation*, with claim confirmation number 002-QHP-Y7L.

## I. Facts[1]

ICOA is in the business of providing various wireless internet access to its clients, which include several large airports and hotels throughout the country. ICOA retains a portion of the fees paid by the end users of the wireless services and then remits a portion of the user fee to its client. (See Verified Complaint, ¶5 at 2).

On or about September 8, 2004, ICOA entered into a stock purchase agreement (the "Stock Purchase Agreement") with AuthDirect, Inc. ("AuthDirect") and its selling stockholders pursuant to which ICOA purchased all of AuthDirect's capital stock. (AuthDirect was in the business of providing certain back-office settlement services necessary to process the type of wireless internet services provided by ICOA). Quaintance was one of Authdirect's selling stockholders at the time of the sale to ICOA, owning some 43% of Authdirect's outstanding capital stock. (See id., ¶¶ 6-7 at 2 and Exhibit 1 attached thereto, Schedule 4(c) at 24).

The Stock Purchase Agreement provided, among other things, that ICOA was to pay Quaintance certain funds prior to and at the closing of the sale, and certain additional payments were to be made and stock offered over time pursuant to certain promissory notes to be executed. A copy of the November 1, 2005 promissory note consolidating and restating ICOA's obligations to Quaintance pursuant to the Stock Purchase Agreement in the principal amount of $94,000 (and reflecting monthly payments of $5,000 commencing December 1, 2005) is attached to ICOA's Verified Complaint as Exhibit 2 (the "Note"). (See id., ¶ 8 at 3).

[1] The following facts are essentially as recited in ICOA's Verified Complaint but are repeated herein for the Court's convenience.

Following the AuthDirect stock sale, Quaintance moved from California to Rhode Island in order to serve as an employee of ICOA at its headquarters in Warwick, Rhode Island. Quaintance resigned as an ICOA employee and returned to California in March of 2006 but remained as an ICOA consultant and was paid as such by ICOA though July of 2006. (See id., ¶ 9 at 3).

ICOA was unable to make the Note payments owed to Quaintance pursuant to the Stock Purchase Agreement, but up until January of 2007 discussions had been ongoing between ICOA and Quaintance with respect to resolving ICOA's liability in a mutually agreeable manner. However, in January of 2007 ICOA learned that Quaintance had illegally transferred four domain names owned by ICOA - (1) www.airportnetworksolutions.com; (2) www.airportwins.com; (3) www.authdirect.com; and (4) www.authdirect.net (previously and hereinafter, the "Domain Names") – from ICOA's registrar, Network Solutions, Inc., to eNom, Inc., another domain name registrar selected by Quaintance. (Copies of invoices evidencing ICOA's registration of the Domain Names with Network Solutions, Inc. in 2005 are attached to the Verified Complaint as Exhibit 3). Upon information and belief, Quaintance was able to accomplish this domain name hijacking in June of 2006 (just prior to his termination as an ICOA consultant) by using the high level security user ID he had obtained while an ICOA employee and consultant. (See id., ¶ 10-11 at 3). (A copy of an e-mail from Network Solutions, Inc. evidencing the transfer of the Domain Names to eNom, Inc. on June 28, 2006 is attached to the Verified Complaint as Exhibit 4).

The hijacked Domain Names were designed by ICOA to be utilized by end users of ICOA's wireless internet services. ICOA's system processes over 10,000 connections per day in over 2,000 locations, including 23 airports (which rely on ICOA's network to provide their flight information display system), over 3,000 rooms in Trump Resort Hotel in Atlantic City, 850 Panera Bread stores, 110 so-called recreational vehicle parks and over 60 marinas. (See id., ¶ 12 at 4).

ICOA also learned that Quaintance had utilized his prior high level security user ID to gain unauthorized access to ICOA's so-called AuthDirect/Tollboth system, pursuant to which ICOA processes credit card payments for certain services provided by ICOA, and Quaintance began illegally diverting funds to his personal account, amounting, upon information and belief, to some $13,783.58, to date.

In addition, Quaintance accessed private credit card numbers from a highly secure database maintained by ICOA and moved the credit card numbers from ICOA's AuthDirect/Tollbooth system to a private, non-secure database outside of ICOA's control, which violates and thus jeopardizes ICOA's agreements with merchant banks with respect to the processing of credit cards. (See id., ¶ 13-14 at 4).

Quaintance has failed and refused to relinquish his unauthorized and illegal control of the Domain Names, despite due demand by ICOA, which has caused and is causing ICOA to sustain irreparable harm including, but not limited to: (a) ICOA's inability to transfer the domain names from eNOM, Inc. (the registrar Quaintance illegally registered the domains with) and to re-register the domain names with ICOA's registrar (Network Solutions, Inc.); (b) provide a secure on-line environment to end users; and (c) properly process credit card transactions. Rather than respond to

ICOA's demands with respect to the Domain Names, Quaintance filed a demand for arbitration with the American Arbitration Association on or about February 1, 2007 with respect to payments alleging owing under the Note, requesting that the arbitration be conducted in San Francisco, California. (See Exhibit 5 attached to the Verified Complaint). In fact, as noted, under the Stock Purchase Agreement, Quaintance agreed to the exclusive jurisdiction of this Court and to the application of Rhode Island law with respect to "any legal action or proceeding arising out of or based upon th[e] Agreement." (See Verified Complaint, ¶ 15-16 at 5; see also Exhibit 1 to the Verified Complaint, § 17(e) at 19).

## III. Argument

### 1. The Standard for Injunctive Relief

As Judge Selya recently noted in Wine and Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 46 (1st Cir. 2005), a district court must weigh four factors in determining whether to issue injunctive relief:

> '(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.' Black Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir.2004) (*citing* Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir.1996)). 'The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.' New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir.2002).

Id.

**a. Likelihood of Success**

**(i) Anticybersquatting Consumer Protection Act, 15 U.S.C. §§ 1114(2)(D), 1125(d) (Count I)**

The elements of a cause of action under the Anticybersquatting Consumer Protection Act ("ACPA") were set forth in Mashantucket Pequot Tribe v. Redican, 403 F.Supp.2d 184, 195 (D.Conn. 2005), where the court noted that the ACPA:

> prevents the use of a domain name, in bad faith with intent to profit, using a protected mark. It provides in relevant part:
>
> > A person shall be liable in a civil action by the owner of a mark ... if, without regard to the goods or services of the parties, that person (i) has a bad faith intent to profit from that mark ... and (ii) registers, traffics in, or uses a domain name that (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; [or] (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark ....

Id., *quoting* 15 U.S.C. § 1125(d)(1)(A).

Registered domain names[2] are entitled to protection under the ACPA, as long as they are either "distinctive or famous,"[3] according to the following factors:

---

[2] The Trademark Act defines "domain name" as "any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet." See Exhibit 4 attached to the Verified Complaint.

[3] Indeed, the ACPA refers to "mark," not "registered mark," which § 1127 defines separately as including "any trademark", which in turn is defined as "any word, name, symbol, or device . . .(1) used by a person, or (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register . . ., to identify and distinguish his or her goods . . .and to indicate the source of the goods." 15 U.S.C. § 1127. As noted by the First Circuit in Sallen v. Corinthians Licenciamentos LTDA, 273 F.3d 14, 24 (1st Cir. 2001): "Mark owner" must be understood against the backdrop of the U.S. trademark law, which provides some protections to unregistered marks." Id., *citing* Walmart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 210, 120 S.Ct. 1339, 146 L.Ed2d 182 (2000); Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S.ct. 2753, 120 L.Ed.2d 615 (1992).

> (A) the degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods or services with which the mark is used; (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third parties.

See Shields v. Zuccarini, 254 F.3d 476, 483 (3rd Cir. 2001), *citing* 15 U.S.C. § 1125(c)(1).

Here, ICOA is and was at all relevant times the "owner" of four "marks" (i.e., the Domain Names), which ownership rights it sought to protect by registering with Network Solutions, Inc..

The Domain Names here have been used exclusively by ICOA for the past two and a half years in the context of its nation-wide business. As has been noted, the hijacked Domain Names were designed by ICOA to be utilized by end users of ICOA's wireless internet services. And ICOA's system processes over 10,000 connections per day in over 2,000 locations, including 23 airports (which rely on ICOA's network to provide their flight information display system), over 3,000 rooms in Trump Resort Hotel in Atlantic City, 850 Panera Bread stores, 110 so-called recreational vehicle parks and over 60 marinas. See Verified Complaint, ¶ 12 at 4. Moreover, since the Domain Names were hijacked, it is apparent that Quaintance's illegal activities involves the use of a "identical or confusingly similar" marks. See 15 U.S.C. § 1125(d)(1)(A)(ii)( l ).

The next question under the ACPA is whether the defendant "has a bad faith intent to profit from [the plaintiff's] mark." 15 U.S.C. § 1125(d)(1)(A)(I). The ACPA lists the following nine factors that may be considered when determining whether an individual has acted with bad faith intent to profit:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
>
> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
>
> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the

> goods or services of the parties; and
>
> (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection(c)(1) of section 43.

See 15 U.S.C. § 1125(d)(1)(B)(I). And under the ACPA the court is not limited to consideration of these factors. As the court noted in Mashantucket Pequot Tribe, *supra*: "The factors are, instead, expressly described as indicia that 'may' be considered along with other facts." 403 F.Supp.2d at 197 (citation omitted).

Here, almost all of the relevant factors suggest the obvious, i.e., that Quaintance intended in bad faith to profit from the illegal use of the Domain Names.

**ii. Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(a)(4), 1030(g) (Count II)**

The Computer Fraud and Abuse Act provides in pertinent part as follows:

> (a) Whoever
> (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;
>
> shall be punished as provided in subsection (c) of this section.

18 U.S.C. §1030 (a)(4).[4]

And the Act goes on to provide that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages ***and injunctive relief*** or other equitable relief," id. at § 1030 (g) (emphasis added), provided that the actionable conduct causes "loss to 1 or

[4]A "protected computer" is broadly defined in the Act as including any computer "used in interstate or foreign commerce or communication . . ." Id. at § 1030 (e)(2)(B).

more persons during any 1-year period aggregating at least $5,000 in value." Id. at § 1030 (a)(5)(B)(i).

Here, it is apparent that Quaintance has violated the Act and that ICOA will likely succeed on the merits of this claim. See, e.g., Register.com, Inc. v. Verio, Inc., 126 F.Supp.2d 238 (S.D.N.Y. 2000) (awarding injunctive relief based upon finding that defendant's access to the plaintiff's database was unauthorized and that defendant violated § 1030(a)(2)(C) by using that unauthorized access to obtain data for mass marketing purposes).

**iii. Conversion**
**(Count IV)**

As has been noted by the Rhode Island Supreme Court: "[t]he gravamen of an action for conversion lies in the defendant's taking the plaintiff's personalty without consent and exercising dominion over it inconsistent with the plaintiff's right to possession." DeChristofaro v. Machala, 685 A.2d 258, 262 (1996) (*quoting* Fuscellaro v. Indus. Nat'l Corp., 368 A.2d 1227, 1230 (1977)). "The determining question is whether the defendant has appropriated to his or her own use the chattel of another without the latter's permission and without legal right." Id. (*quoting* Terrien v. Joseph, 53 A.2d 923, 925 (1947)). To sustain an action for conversion, a plaintiff must prove ownership or possessory interest in the property at the time of the conversion. Id. at 263. Money, where specifically identifiable, can be the subject matter of an action for conversion where the defendant is under an obligation to deliver specific money to the plaintiff. Id..

Here, ICOA will likely succeed on the merits of its conversion claim because it was the rightful owner and registrant of the Domain Names and the time they were

converted by being hijacked and re-registered (see Verified Complaint, ¶ 11 at 3-4 and Exhibit 3 to the Verified Complaint), and to date, Quaintance has converted some $13,783.58 of ICOA's funds. See id., ¶ 13 at 4.

**iv. Fraud (Count V)**

The elements of fraud under Rhode Island law include: (1) a false representation, (2) intent that the plaintiff rely on that representation, (3) justifiable reliance on the part of the plaintiff on the false representation, and (4) resultant damages. See Zaino v. Zaino, 818 A .2d 630, 638 (R.I.2003); Travers v. Spidell, 682 A.2d 471, 472-73 (R.I.1996).

Here, Quaintance: (1) falsely represented to ICOA while an employee and a consultant that it would keep ICOA's proprietary information confidential and not use it for its own gain; (2) intended for ICOA to rely on that representation by providing him with a high level security user ID. And ICOA: (3) justifiably relied upon the false representations of Quaintance and provided him with the ID; and (4) has been damaged as a result.

Therefore, ICOA is likely to prevail on its claim of fraud.

**v. Tortious Interference with Contract (Count VI)**

A prima facie case of tortious interference with a contractual relationship under Rhode Island law requires proof of: (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional interference; and (4) damages resulting therefrom. Jolicouer Furniture Co., Inc. v. Baldelli, 653 A.2d 740, 752 (R.I.1995) (citing Smith Development Corp. v. Bilow Enterprises, Inc., 308

A.2d 477, 482 (R.I.1973)). A defendant who intentionally and improperly interferes with a plaintiff's rights under a contract with another person is subject to tort liability "if the interference causes the plaintiff to lose a right under the contract or makes the contract rights more costly or less valuable." Jolicouer Furniture Co., 652 A.2d at 752 (*citing* W. Page Keeton, et al., Prosser and Keeton on the Law of Torts, § 129 at 978 (5th ed.1984)).

In a cause of action for intentional and malicious interference with a contractual relationship, the term "malice" does not mean that proof is required of a defendant's spite or ill will towards the contracting party or parties. Jolicoeur, 653 A.2d at 753. Rather, "legal malice - an intent to do harm without justification - will suffice." Id., *quoting* Mesolella v. City of Providence, 508 A.2d 661, 669-70 (R.I.1986).

Here, ICOA will likely succeed on its claim of intentional interference with contract inasmuch as: (1) there was a contract between ICOA and Network Solutions, Inc. relative to the registration of the Domain Names; (2) Quaintance evidenced by his very conduct that he had full knowledge of this contract; (3) Quaintance intentionally interfered with the existence of this contract by in effect canceling it and re-registering the Domain Names with another registrar; and (4) damages resulted as a proximate result of this conduct.

**vi. Interference with Prospective Business Advantage (Count VII)**

Rhode Island recognizes a separate cause of action for interference with prospective business advantage. As noted by the Rhode Island Supreme Court: "[o]ne who intentionally and improperly interferes with another's prospective contractual relation ... is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation." Mesollella v. City of Providence, 508 A.2d 661, 669 (R.I.1986), *quoting* Restatement (Second) Torts, § 766B at 20 (1979). The elements of this claim are (1) the existence of a business relationship or expectancy; (2) knowledge by the interferor of the relationship or expectancy; (3) an intentional act of interference; (4) proof that the interference caused the harm sustained; and (5) damages to the plaintiff. Id. The plaintiff must prove that the defendant acted with legal malice, which is defined as the intent to do harm without justification. Id. at 669-70.

Unlike claims of interference with contractual relations, claims of interference with prospective business advantage do not require plaintiff to prove the existence of a valid contract, but it must establish either that "but for the interference there would have been a relationship or that it is reasonably probable that but for the interference the relationship would have been established." Id. at 671.

Here, Quaintance was well aware that the very existence of the Domain Names and of IOCA's Auth/Direct/Tollbooth system was premised upon an

expectation of a business relationship with users of ICOA's wireless internet products. And Quaintance, by virtue of his relationship with ICOA and as evidenced by his conduct, had full knowledge of this expectancy and engaged in an intentional act of interference, which was the proximate cause of damage to ICOA.

### vi. Breach of Employee's Duty of Loyalty (Count VIII)

Employees and/or consultants like Quaintance owe a duty of loyalty to their employers under Rhode Island law. See Rego Displays v. Fournier, 379 A.2d 1098, 1101 (1977). Quaintance breached this duty when he knowingly and willfully used confidential information had had obtained while in ICOA's employ to hijack the Domain Names and wrongfully divert funds owing to ICOA into his personal account.

### vii. RIGL § 9-1-2 (Count IX)

RIGL § 9-1-2 provides in pertinent part as follows:

> Whenever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for the injury in a civil action against the offender, and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made; and whenever any person shall be guilty of larceny, he or she shall be liable to the owner of the money or articles taken for twice the value thereof, unless the money or articles are restored, and for the value thereof in case of restoration.

Id.

In hijacking ICOA's Domain Names and converting (to date) some $13,783.58, Quaintance was guilty of larceny under Rhode Island law, see RIGL §

11-41-5 and therefore is liable to ICOA pursuant to RIGL § 9-1-2 for twice the amount taken, plus whatever additional damages were sustained.

**b. Irreparable Harm**

ICOA is being irreparably harmed and will continue to be so harmed if its motion for a temporary restraining order is not granted. This irreparable harm includes (and will continue to include) as a result of: (a) ICOA's inability to transfer the domain names from eNOM, Inc. (the registrar Quaintance illegally registered the domains with) and to re-register the domain names with ICOA's registrar (Network Solutions, Inc.); (b) provide a secure on-line environment to end users; and (c) properly process credit card transactions.

In terms of precise monetary damages other than the $13,783.58 which has been diverted to date, it is difficult if not impossible to calculate the lost business proximately resulting from the acts of Quaintance which are described in the Verified Complaint. However, as noted in Register.com, Inc. v. Verio, Inc., 126 F.Supp.2d 238, 252 (S.D.N.Y. 2000) in a similar factual context:

> A potential harm which cannot be addressed by a legal or equitable remedy following a trial, such as the loss of customers that might result from a system shutdown or slowed response times complained of here, constitutes an irreparable injury. See Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 799-800 (3rd Cir.1989); Cyber Promotions, Inc. v. Apex Global Info. Services, 1997 WL 634384, at *2 (E.D.Pa.1997). A showing that a plaintiff may suffer a substantial loss of business if relief is not granted meets the standards for interim relief. See Doran v. Salem Inn, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).

Id.

**c. Balancing the Equities and the Public Interest**

Under the circumstances, little time need be spent balancing the equities and considering the public interest. The outrageous conduct described in the Verified Complaint is exactly the type of illegal behavior which Congress sought to curtail by enacting the Anticybersquatting Consumer Protection Act and the Computer Fraud and Abuse Act.

## IV. Conclusion

For all the above reasons, ICOA's Motion for a Temporary Restraining Order should be granted.

Plaintiff,
ICOA, INC.,
By its attorney,

/s/______________________
Anthony F. Cottone, #3922
55 Dorrance Street, Suite 400
Providence, RI 02903
Tel: (401) 578-5696
Fax: (401) 861-2922
cottonelaw@cox.net

**CERTIFICATION**

I hereby certify that a true and accurate copy of the above Memorandum was sent by certified mail, return receipt requested, postage pre-paid, to Kevin Quaintance, 2701 Laramie Gate Circle, Pleasanton, CA 94566, and was also sent to Kevin Quaintance by fax at (831) 597-9880 and by electronic mail at kevin@quaintance.net, on this 22nd day of February, 2007.

/s/______________________