UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ICOA, INC., Plaintiff | : | |
| vs. | : | C.A. No. 07-069 S |
| KEVIN QUAINTANCE, Defendant | : | |

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

Defendant, Kevin Quaintance submits the following Memorandum in Opposition to Plaintiff's Motion for a Temporary Restraining Order. Defendant was not properly served in this action, he never received the exhibits referenced by the motion, nor were the documents he did receive properly formatted; Defendant therefore reserves the right to object to the service of this motion and submits the following opposition without prejudice.

## FACTUAL BACKGROUND

Although AuthDirect, Inc. ("AuthDirect") was a company acquired by Plaintiff, and Defendant was a shareholder and officer of such company, most of the other allegations made by Plaintiff are blatantly false and/or omit numerous adverse facts. To begin with, Plaintiff admits that it failed to honor its obligations under a promissory note issued to Defendant (See Plaintiff's Memorandum at pages 2 and 3). This is in direct contradiction to its assertion on Page 2 of its SEC Form 8-K filed on December 22, 2004 (attached as Exhibit A), which states: "In August 2004, the Company [Plaintiff] acquired all of the… shares of capital stock of AuthDirect, Inc.… The Company has issued all shares and warrants, and paid all cash amounts, required in this transaction…"

Plaintiff has also left out numerous details regarding its breaches of obligations under the Stock Purchase Agreement between Plaintiff and AuthDirect (the "AuthDirect SPA", included on pages 6 through 21 of Plaintiff's SEC Form 8K attached as Exhibit A). Specifically, so many obligations under the AuthDirect SPA had been breached that on November 1, 2005 Plaintiff asked Defendant to enter into a new subscription agreement with the intent to supersede various provisions of the AuthDirect SPA, pursuant to which various promissory notes were issued to Defendant and Joel Stalder, another former AuthDirect shareholder and officer ("Stalder"), along with a security agreement providing for enforcement in the event of Plaintiff's default on the promissory notes (the "Subscription Agreement" is attached hereto as Exhibit B, the "Promissory Notes" are attached hereto as Exhibits C-E, and the "Security Agreement" as Exhibit F). The total amount due under the Promissory Notes is now $407,084.67, including interest and penalties (see Exhibit G); Plaintiff never actually made the regular payments it promised pursuant to the Subscription Agreement.

Plaintiff has attempted to characterize a levy of various accounts of Plaintiff in August 2006 as "theft" and "illegal diversion", even though this was expressly authorized by the Security Agreement, which states in relevant part in Section 3(d):

> **Upon the occurrence of an Event of Default, the Company [Plaintiff] hereby appoints the Secured Party [Defendant] as its attorney-in-fact, with full authority in the place and stead of the Company and in the name of the Company or otherwise, from time to time in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may reasonably deem necessary to accomplish the purposes of this Agreement, <u>including without limitation, to receive and collect all instruments made payable to the Company representing any payments in respect of the Pledged Collateral or any part thereof and to give full discharge for the same. The Secured Party may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Pledged Property as and when the Secured Party may determine...</u>**

Section 3(e) goes on to provide even further rights to Defendant:

> **Upon the occurrence of an Event of Default, the Secured Party shall: (i) be entitled to receive all distributions with respect to the Pledged Collateral, (ii) to cause the Pledged Property to be transferred into the name of the Secured Party or its nominee, (iii) to dispose**

**of the Pledged Property, and (iv) to realize upon any and all rights in the Pledged Property then held by the Secured Party.**

Needless to say, at the time of the account levy, all of the Promissory Notes were in default. Moreover, Defendant provided Erwin Vahlsing, the chief financial officer of Plaintiff ("Vahlsing"), a letter detailing his intent to levy the accounts in question pursuant to the Security Agreement on August 17, 2006, 10 days prior to his levy of the accounts (see Levy Notice Letter attached as Exhibit H, along with proof of receipt attached as Exhibit I). Defendant also initiated numerous calls to Vahlsing and other personnel of Plaintiff, but never received a response and therefore proceeded with the account levy, from which he levied a total of $12,008.

Plaintiff's attempts to characterize this account levy as "theft" is absurd. Defendant was entitled to system access by virtue of the Security Agreement. Moreover, upon objection from Plaintiff to his levy, and in the interest of obtaining an amicable resolution to the dispute, Defendant immediately stopped levying the accounts. The entire time period of the levy was approximately 3 days, and at no time was there a subsequent levy, even though Plaintiff never made any attempt to engage with Defendant in good faith and Defendant would have been within his rights to have engaged in a subsequent levy. Also, Plaintiff removed Defendant's access to all accounts, in violation of the Security Agreement, and as a result Defendant would not have been able to access any accounts subsequently even if he had wanted to.

Additionally, Plaintiff has falsely asserted that it ever was entitled to own the Domain Names at issue, and has failed to attach supporting documentation proving such ownership. Specifically, the AuthDirect SPA does not state that any of the Domain Names were to be transferred. In fact, Schedule 4(k) of the AuthDirect SPA (entitled "Asset List") was not included in its SEC Form 8K filing. The reason for this is that the domain names "authdirect.com" and "authdirect.net" were never intended to be transferred, but rather merely licensed to Plaintiff

until Plaintiff had complied with all of its obligations as delineated in the AuthDirect SPA (please see Declaration of Joel Stalder, attached hereto as Exhibit J). The nearly identical situation occurred with regard to the domain names "airportnetworksolutions.com" and "airportwins.com", which were never entitled to be owned by Plaintiff, but merely licensed pending the fulfillment of Plaintiff's financial obligations (please see Declaration of Pam Brown, attached hereto as Exhibit K). For purposes hereof, these licenses shall be referred to as the "License Agreement(s)".

Moreover, Defendant specifically informed Vahlsing verbally in June 2006 of his intent to transfer the Domain Names back to their rightful owners after it became clear that Plaintiff had no intention of honoring its obligations to Defendant. Vahlsing ignored these statements and therefore Defendant proceeded to transfer the Domain Names.

Needless to say, Plaintiff never did comply with its obligations, but did transfer such domain names to itself in violation of the License Agreement. As a result, a transfer of these domain names back to their rightful owners could not be considered "misappropriation", "cybersquatting", or "theft" for the simple reason that Plaintiff never was entitled to own them; in fact, if any party is guilty of theft or cybersquatting, it is Plaintiff and not Defendant.

It should also be noted that no internet traffic was ever diverted, credit card numbers used in fraudulent transactions or any other conduct has been alleged to have actually occurred, even though Plaintiff admits that the domain names in question were transferred on or about June 2006 (Plaintiff's Memorandum Page 3). Although Plaintiff's Memorandum contains numerous provocative statements about potential diversions, fraud, theft and other matters, Plaintiff fails to provide allegations of a single case which actually occurred, even though approximately 8 months have passed since the transfers.

Finally, Plaintiff asserts that Defendant's initiation of arbitration proceedings was improper (Plaintiff's memorandum Page 5). Defendant then cites the AuthDirect SPA, conveniently neglecting to mention that the Subscription Agreement executed on November 1, 2005, superseded the AuthDirect SPA. In the second recital of the Subscription Agreement it states:

> **WHEREAS, the Company [Plaintiff] and Quaintance [Defendant] desire to restructure the note from the Company to Quaintance dated September 8, 2004 in the face amount of $40,000 (the "Old Quaintance Note"), the note from AuthDirect to Quaintance, dated January 6, 2004 in the face amount of $50,000 (the Quaintance AD Note"), amounts due to US Bank- Visa and to Graebel Moving Systems on behalf of Quaintance..."**

Moreover, Section 5.3 of the Subscription Agreement states:

> **Section 5.3 Entire Agreement; Amendment and Waiver**
>
> **This Agreement, together with the New Quaintance Note, the Quaintance Visa Note and the Quaintance Graebel Note, constitutes the entire agreement of the parties hereto and supersedes all prior agreements or understandings (written or oral) among such parties, with respect to the Notes executed of even date herewith...**

Although the Subscription Agreement does contain a governing law provision (in Section 5.5), it is silent on whether dispute resolution is to be conducted by litigation or arbitration. Arbitration is however specifically provided for in the Promissory Notes (see e.g. Exhibit C, page 4: "**Any dispute arising out of or in connection with this Note shall be conclusively resolved by final and binding arbitration conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association**..."). Therefore Defendant was well within his rights to commence an arbitration proceeding. In fact, Plaintiff's recently alleged "discovery" of the transfer of the Domain Names which occurred 8 months prior, could appear to be a smokescreen for Plaintiff's true intent to derail Defendant's attempt to initiate arbitration to collect the approximately $400,000 owing on his delinquent Promissory Notes.

## ARGUMENT

### A. Likelihood of Success on the Merits

All of Plaintiff's counts are essentially different formulations of the following allegation: (i) Defendant improperly transferred the Domain Names; and (ii) Defendant misappropriated funds from Plaintiff. Although these counts are cast variously as violations of the Anticybersquatting Consumer Protection Act, Computer Fraud and Abuse Act, RIGL Section 9-1-2, fraud, conversion, tortious interference with contract, etc., all of them depend on one or more of the following factual predicates: (a) Plaintiff actually was entitled to own the Domain Names; (b) Defendant misrouted network traffic, or otherwise actually impeded customer and/or vendor relationships of Plaintiff; and (c) Defendant improperly took funds from Plaintiff.

Plaintiff has cleverly pled its complaint to avoid making concrete factual allegations which support these predicates, but instead states them in terms of legal conclusions. Additionally, Plaintiff failed in its Complaint and Memorandum to mention the Security Agreement (or the Levy Notice Letter), for the simple reason that to do so would make it impossible to find that Defendant had misappropriated any funds. Indeed any alleged disruption due to the levy is clearly authorized by the plain language of the Security Agreement, and is merely an attempt by Plaintiff to fabricate allegations of tortious conduct out of contractually permitted collection activity. Moreover, any alleged disruption of activity due to the transfer of the Domain Names could not possibly have been significant (if it even occurred, which Defendant disputes), otherwise Plaintiff would most certainly been aware of it in less than 8 months.

**B. Irreparable Harm**

Plaintiff complains of the potential for irreparable harm resulting from (a) its inability to transfer the Domain Names to a different registrar; (b) alleged inability to provide a secure environment; and (c) properly process credit card transactions (Plaintiff's Memorandum Page

15). To begin with, there is no harm involved in having the Domain Names registered with one registrar as opposed to another, and this is merely an attempt by Plaintiff to cast its allegations of ownership of the Domain Names into the context of irreparable harm. Plaintiff's concerns regarding a secure environment and inability to process credit card transactions are blatantly false since it has not, and cannot, allege a single actual incidence of security breaches or inability to process credit card transactions as a result of the transfers, even though the transfers occurred approximately 8 months previously.

Due to the amount of time that has passed since the transfers, it is obvious that if harm were to occur, Plaintiff would have described concrete examples of such occurrences along with supporting evidence. Plaintiff's failure to do so and reliance on potential future damages makes this point very clear.

Additionally, Plaintiff again attempts to cast the levy by Defendant pursuant to the Security Agreement as illegal diversion. This seems especially out of place given that Plaintiff failed to respond to the Levy Notice Letter prior to the levy, and that Plaintiff removed Defendant's access to accounts after the levy (again in violation of the Security Agreement). Moreover, since Defendant has not accessed the account since August 2006, and does not have access currently, it is difficult to understand how there could possibly be any basis for irreparable harm under the circumstances.

**C. Balance of Hardships.**

Plaintiff has thoroughly abused its position of power over Defendant by failing to honor its obligations delineated in the Promissory Notes, thus placing Defendant in a precarious position. Upon initiating an arbitration proceeding to collect upon the delinquent Promissory Notes (as authorized by the Promissory Notes), Plaintiff promptly "discovered" alleged

improprieties which occurred many months earlier. Plaintiff is a publicly traded corporation with substantial capital investment; whereas Defendant is an individual who has made significant personal sacrifices to work with Plaintiff, spent significant sums of his own money to develop AuthDirect and assumed debts in good faith upon the promise of repayment by Plaintiff. In turn, Plaintiff failed to honor its obligations to Defendant.

Plaintiff has not been able to clearly articulate what hardships it has incurred, other than the assertions addressed in the foregoing section dealing with irreparable harm. If the temporary restraining order is granted, Defendant will have his arbitration stayed (to which he is entitled pursuant to the Promissory Notes), which will cause him to incur significant hardship as he will not be able to collect upon the over $400,000 to which he is entitled. Defendant will also be at the risk of Plaintiff selling or otherwise assigning the Domain Names and of therefore losing his property rights in violation of the License Agreement.

Given that the balance of hardships clearly favors Defendant, it is not surprising that Plaintiff's Memorandum fails to even address the balance of hardships (see Plaintiff's Memorandum at Page 16).

**D. Balancing the Equities and the Public Interest.**

Plaintiff has repeatedly tried to make Defendant's levy pursuant to the Security Agreement and faithful following of the license to the Domain Names appear to be theft. In doing so, Plaintiff failed to attach relevant documents and make other disclosures which show that its initiation of this action is nothing more than an attempt to breach the license to the Domain Names and stop Defendant's attempts to collect upon the Promissory Notes.

Granting the temporary restraining order would reward the sort of conduct inimical to equity. Plaintiff has admittedly repeatedly failed to keep its promises to Defendant, and at every opportunity has divested him of his rights. Unfortunately, this legal action is simply the latest in a long series of such occurrences.

**E. Latches.**

Plaintiff is additionally subject to latches as it has clearly delayed action for an extended period of time relating to its claims. This is uncontested in the case of the levy performed by Defendant, and is especially evident in Plaintiff's failure to respond to the Levy Notice Letter. As far as the Domain Names are concerned, 8 months passing is clearly more than enough to establish that Plaintiff is subject to the doctrine of latches.

**F. Unclean Hands.**

Finally, and most significantly, Plaintiff's cavalier attitude about honoring its obligations is clear from its failure to make timely payments on the Promissory Notes, as well as its failure in this proceeding to make any reference to the Security Agreement, the superseding Subscription Agreement or otherwise include relevant information detailing the true nature of the dispute. Plaintiff's conduct, compounded by its inflammatory and unsupported allegations about Defendant, alone are enough to bar Plaintiff from obtaining equitable relief.

**CONCLUSION**

The basis for Plaintiff's temporary restraining order is that Defendant has engaged and will continue to engage in theft, fraud and other criminal actions. A cursory review of the Security Agreement, the Levy Notice Letter (and Plaintiff's lack of response thereto), Plaintiff's cutting off access to accounts (in violation of the Security Agreement), Plaintiff's repeated failure to make Promissory Note payments, false assertions about lack of jurisdiction for the

arbitration proceeding (in spite of clear language mandating arbitration in the Promissory Notes), and generally misleading language which attempts to create the impression that Defendant has "hacked" into Plaintiff's computer system to access customer credit card numbers to sell on the black market compels the conclusion that this entire proceeding was undertaken in bad faith.

Plaintiff's temporary restraining order should be denied.

Respectfully,

/s/ [signature]

Kevin Quaintance
Defendant in Pro Se
2701 Laramie Gate Cir.
Pleasanton, CA 94566
+1-510-393-3370
+1-831-597-9880
Kevin@quaintance.net