# EXHIBIT A

# COVER PAGE

---

This page is intentionally blank. Exhibit begins on next page.

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 KyKRngZjzrI66BBhxf7BW6nS6DwAb+4vpZ3M0dh6DikC719GBGP5rOCSfZ4hSiM2
 aFNTukmok7TckN0vCHqOSw==

<SEC-DOCUMENT>0001172665-04-000554.txt : 20041222
<SEC-HEADER>0001172665-04-000554.hdr.sgml : 20041222
<ACCEPTANCE-DATETIME>20041222143341
ACCESSION NUMBER: 0001172665-04-000554
CONFORMED SUBMISSION TYPE: 8-K
PUBLIC DOCUMENT COUNT: 6
CONFORMED PERIOD OF REPORT: 20041221
ITEM INFORMATION: Completion of Acquisition or Disposition of Assets
ITEM INFORMATION: Financial Statements and Exhibits
FILED AS OF DATE: 20041222
DATE AS OF CHANGE: 20041222

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: ICOA INC
CENTRAL INDEX KEY: 0000745084
STANDARD INDUSTRIAL CLASSIFICATION: TELEPHONE COMMUNICATIONS (NO RADIO TELEPHONE) [4813
IRS NUMBER: 870403239
STATE OF INCORPORATION: NV
FISCAL YEAR END: 1231

FILING VALUES:
FORM TYPE: 8-K
SEC ACT: 1934 Act
SEC FILE NUMBER: 000-32513
FILM NUMBER: 041220362

BUSINESS ADDRESS:
STREET 1: 111 AIRPORT RD
CITY: WARWICK
STATE: RI
ZIP: 02889
BUSINESS PHONE: 4017399205

MAIL ADDRESS:
STREET 1: 111 AIRPORT RD
CITY: WARWICK
STATE: RI
ZIP: 02889

FORMER COMPANY:
FORMER CONFORMED NAME: ICOA INC /PA
DATE OF NAME CHANGE: 20001117

FORMER COMPANY:
FORMER CONFORMED NAME: QUINTONIX INC
DATE OF NAME CHANGE: 19870403
</SEC-HEADER>
<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<FILENAME>form8k.txt
<DESCRIPTION>ITEMS 2.01 & 9.01
<TEXT>


SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

------------------

FORM 8-K

CURRENT REPORT

PURSUANT TO SECTION 13 OR 15(d) of the
SECURITIES EXCHANGE ACT OF 1934

-----------------

Date of Report (Date of earliest event reported): December 18, 2003

ICOA, Inc.
(Exact Name of Registrant as Specified in Charter)

| Nevada | 0-32513 | 87-0403239 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 111 Airport Road, Warwick, Rhode Island | 02889 |
|---|---|
| (Address of principal executive offices) | (Zip code) |

(401) 352-2300
Registrant's telephone number, including area code

Not Applicable
(Former Name or Former Address, If Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

<PAGE>

ITEM 2.01. ACQUISITION OR DISPOSITION OF ASSETS

In December 2003, ICOA, Inc., a Nevada corporation (the "Company"), acquired all of the issued and outstanding shares of capital stock of Airport Network Solutions, Inc., a Delaware corporation pursuant to the issuance of a convertible promissory note in the principal amount equal to $200,000. Airport Network Solutions designs and manages Wi-Fi solutions for the airport industry. The note accrues interest at an annual rate equal of five percent (5%). The note is due and payable on December 18, 2005. At any time prior to the maturity date of the note, provided the Company has sufficient authorized shares of common stock available, the note is convertible at the option of the holder into such number of shares of common stock that is obtained by dividing the sum of the outstanding principal balance of the note by $0.01. All accrued and unpaid interest on the note is payable in cash at the time of conversion of the Note. The Company's prior disclosure in its public filings was not accurate with respect o the payment details of this transaction. Even if the Company does not receive shareholder approval to increase its authorized shares of common stock, this acquisition cannot be unwound by any of the parties to the transaction.

In August 2004, the Company acquired all of the issued and outstanding shares of capital stock of AuthDirect, Inc., a California corporation pursuant to (i) the issuance of 1,500,000 shares of common stock of the Company, (ii) $170,000 in cash and notes, and (iii) warrants to purchase 1,500,000 shares of common stock. AuthDirect provides back-office settlement services and network monitoring for Wi-Fi providers. The Company's prior disclosure in its public filings was not accurate with respect to the payment terms of this transaction. The Company has issued all shares and warrants, and paid all cash amounts, required in this transaction. This acquisition cannot be unwound by any of the

parties to this transaction.

ITEM 9.01. FINANCIAL STATEMENTS AND EXHIBITS

(a) Financial Statements

Not applicable.

(b) Pro Forma Financial Information

Not applicable.

(c) Exhibits

<TABLE>
<CAPTION>

| Exhibit | Description | Location |
|---|---|---|
| <S> | <C> <C> | |
| 16.1 | Convertible Promissory Note, dated December 18, 2003 in the principal amount of $200,000 issued by ICOA, Inc. | Provided herewith |
| 16.2 | Stock Purchase Agreement, dated September 8, 2004, by and among ICOA, Inc., AuthDirect, Inc. and the shareholders of AuthDirect, Inc. | Provided herewith |
| 16.3 | Consulting Agreement, dated September 8, 2004, by and among ICOA, Inc., and Kevin Quaintance. | Provided herewith |
| 16.4 | Consulting Agreement, dated September 8, 2004, by and among ICOA, Inc., and Joel Stalder | Provided herewith |
| 16.5 | Form of Warrant, dated September 8, 2004, by and among ICOA, Inc. and the shareholders of AuthDirect, Inc. | Provided herewith |

</TABLE>

2

<PAGE>

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

ICOA, INC.

Date: December 21, 2004

By: -------------------

Name: Erwin Vahlsing, Jr.
Its: Chief Financial Officer and Director

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-16.1
<SEQUENCE>2
<FILENAME>ex161.txt
<DESCRIPTION>CONVERTIBLE PROMISSORY NOTE
<TEXT>

THIS NOTE AND THE SECURITIES ISSUABLE UPON ITS CONVERSION HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAW, AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION UNDER THE ACT OR IN A TRANSACTION WHICH, IN THE OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY, QUALIFIES AS AN EXEMPT TRANSACTION UNDER THE ACT AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER.

CONVERTIBLE PROMISSORY NOTE

$200,000 December 23, 2003

1. Obligations

(a) The undersigned, ICOA, Inc., a Nevada corporation having an address at 111 Airport Rd., Warwick, RI 02919 (the "Company"), has agreed to acquire 100% of the outstanding shares of Airport Network Solutions, Inc. (ANS) for the cash sum of Two Hundred Thousand ($200,000). The Company hereby promises to pay to the Shareholders of ANS, as identified in Schedule A attached hereto, together with their successors, representatives and permitted assigns (the "Holder"), in accordance with the terms hereinafter provided, the principal amount of Two Hundred Thousand Dollars ($200,000) in the aggregate, together with interest thereon as set forth herein, on December 18, 2005, (the "Maturity Date"), at the Holder's address as set forth in Schedule A, or such other place as the Holder shall specify in writing.

(b) The outstanding principal balance of this Note shall bear interest at a rate per annum equal to Five percent (5%) from the date which is one year from the date hereof until paid in full, unless earlier converted as provided herein. Interest shall be computed on the basis of a 360-day year of twelve (12) 30-day months.

(c) All payments received from the Company hereunder shall be applied, first, to the payment of expenses and fees due to the Holder pursuant to the terms of this Note; second, to the payment of interest accrued and unpaid on this Note; and third, to reduce the principal balance hereunder.

(d) The Company shall not be entitled to prepay the unpaid principal balance hereof, in whole or in part, except by written consent of the Holder.

2. Conversion at the Option of the Holder At any time and from time to time prior to the Maturity Date, at such time as the Company shall have authorized a sufficient number of shares of Common Stock to effect the forgoing (the "Conversion Shares"), this Note shall be convertible (in whole or in part), at



<PAGE>

the option of the Holder by prior written notice to the Company, into such number of fully-paid and non-assessable shares of Common Stock that shall be obtained by dividing the sum of the outstanding principal amount to be converted, by the $0.01 per share. Accrued, but unpaid interest at the time of conversion shall be paid in cash. Upon such conversion, this Note and the obligations evidenced thereby shall be cancelled and shall be of no further force and effect. If at any time the Holder shall convert less than the full value of this Convertible Promissory Note, the Company shall re-issue the note for the then remaining value.

3. Expenses.

The Company agrees to pay to the Holder all reasonable expenses incurred by the Holder, including reasonable attorneys' fees, in enforcing and collecting this Note.

4. Events of Default.

Each of the following events shall constitute a default under this Note (each an "Event of Default"): (a) any default shall occur in the payment of any amount payable under this Note, (b) any proceedings are instituted in a court of competent jurisdiction for the reorganization, liquidation, or dissolution of the Company or for its adjudication as a bankrupt or insolvent and if instituted by a third party, such proceedings are not dismissed, discharged or stayed within sixty (60) days from the date such proceedings are instituted; (c) the Company makes an assignment for the benefit of its creditors; (d) a receiver, liquidator, assignee, trustee or custodian is appointed to administer the affairs of the Company; or (e) the Company dissolves, liquidates or winds-up its business and operations.

Upon the occurrence and at any time during the continuance of any Event of Default, the Holder shall be entitled to (a) declare this Note, and any and

all principal, interest and other amounts due under this Note to be immediately due and payable, and (b) exercise or otherwise enforce any one or more of the Holder's rights, powers, privileges, remedies and interests under this Note or applicable law.

7. Holder's Representations. By its acceptance of this Note, Holder confirms the following to the Company:

(a) All subsequent offers and sales of the Conversion Shares shall be made pursuant to an effective registration statement under the Securities Act of 1933, as amended, and applicable state securities laws or pursuant to an applicable exemption from such registration.

(b) Holder: (i) has been provided with sufficient information with respect to the business of the Company and its subsidiaries and such documents relating to the Company and its subsidiaries as such Holder has requested and Holder has carefully reviewed the same, and (ii) has had access to management of the Company and the opportunity to discuss the information provided by management of the Company and any questions that Holder had with respect thereto have been answered to the full satisfaction of Holder.



<PAGE>

8. Note Obligations Binding; No Waiver.

This Note is binding on the Company and its respective successors and assigns, and the Company hereby waives presentment, demand, notice and protest and any defense by reason of an extension of time for payment or other indulgences. Failure of the Holder to assert any right herein shall not be deemed to be a waiver thereof.

9. Governing Law.

This Note shall be governed by and construed and enforced in accordance with the laws of the State of Rhode Island, without giving effect to principles of conflicts of law thereof.

10. Amendment; Severability.

This Note may not be modified, amended or waived except in writing signed by the Holder.

ICOA, INC.

By: /s/ Erwin Vahlsing, Jr.
Name: Erwin Vahlsing, Jr.
Title: CFO



<PAGE>

Schedule A
Airport Network Solutions, Inc. - Shareholders

| | |
|---|---|
| Richard Schiffmann<br>113 Hoffmann Ave.<br>San Francisco, CA 94114 | 50.97% |
| Pamela Brown<br>4615 NE Alameda St<br>Portland, OR 97213 | 44.61% |
| Kim Staskus<br>113 Hoffmann Ave.<br>San Francisco, CA 94114 | 4.43% |

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-16.2
<SEQUENCE>3
<FILENAME>ex162.txt
<DESCRIPTION>STOCK PURCHASE AGREEMENT
<TEXT>

STOCK PURCHASE AGREEMENT

AGREEMENT made September 8, 2004, by and between ICOA, Inc., a Nevada corporation ("Buyer"), AuthDirect, Inc., a California corporation (the "Company"), and the Selling Stockholders listed on the signature page hereto as the "Selling Stockholders").

WHEREAS, the Selling Stockholders are the owners of 100% of the capital stock of the Company; and

WHEREAS, Buyer desires to purchase, and the Selling Stockholders desire to sell, all of the Shares held by the Selling Stockholders; and

WHEREAS, the Company has outstanding indebtedness to two of the Selling Stockholders (the "Promissory Notes"), which Buyer and Selling Stockholders desire to eliminate from the Company's balance sheet concurrent with the purchase and sale of the Company Shares (as defined below).

NOW, THEREFORE, it is hereby mutually agreed as follows:

1. Sale and Purchase of Shares. Subject to the terms and conditions set forth in this Agreement, at the Closing, as hereinafter defined, the Selling Stockholders shall sell to Buyer, and Buyer shall purchase from the Selling Stockholders, all of the outstanding shares of Company (the "Company Shares"). At the Closing, the Selling Stockholders shall deliver the certificates representing the Company Shares, duly endorsed for transfer to the Company, free and clear of any liens, claims and encumbrances.

2. Purchase Price and Payments on Promissory Notes.

(a) The Purchase Price for the Company Shares is as follows:

(1) a cash total of $170,000, of which $10,000.00 has been previously paid as a non-refundable deposit and $30,000 has been previously paid as a good faith payment, and the balance which shall be paid as follows, by Seller check payable as designated by the Selling Stockholders, to be divided among the Selling Stockholders as set forth on Schedule 2a)

| | |
|---|---|
| $ 30,000 | which shall be paid on the Closing Date, |
| $ 50,000.00 | which shall be paid on the date forty-five (45) days after the Closing Date, and |

<PAGE>

$ 50,000.00 which shall be paid on the date ninety (90) days after the Closing Date; and

(2) 1,500,000 shares of ICOA, Inc. Common Stock, par value $.0001 per share (the "ICOA Common Stock") subject to required SEC regulations, said ICOA Common Stock to be delivered as of, when and conditioned upon the authorization by the shareholders of Buyer of an increase in the authorized shares of Common Stock, and said shares of ICOA Common Stock to be divided among the Selling Stockholders as set forth on Schedule 2(a); provided however, that at the option of the ICOA, up to 80% of said shares may be in the form of shares of ICOA, Inc. Preferred Stock, said Preferred Stock to be convertible into shares of ICOA Common Stock in such form and under such terms, conditions, rights and restrictions as the Seller shall determine; and

(3) Warrants to purchase an aggregate 1,500,000 shares of ICOA Stock at an exercise price of $.05 per share, exercisable for three years from the date said Warrants become exercisable, subject to required SEC regulations. Said Warrants are to be delivered at Closing, but exercisability of the Warrants will be delayed until the date ten business days following the date of the authorization by the shareholders of Buyer of an increase in the authorized shares of Common Stock, but in no event later than the date nine months from the date of this Agreement; and said Warrants shall be divided among the Selling Stockholders as set forth on Schedule 2(a).

(b) $80,000 in Promissory Notes to be assumed by Buyer at the Closing and to be paid as described on Schedule 2(b).

3. The Closing. (a) The Closing shall be held at the offices of Francis D. Parisi, Esq., 202 Broadway, Providence, RI, 02903 at 10:00 am on the date 10 business days after all of Buyer's Conditions to Closing as set forth in Section 5 hereof have been satisfied or such other date and time as may be agreed upon by the parties in writing (the "Closing Date").

(b) Between the date of this Agreement and the Closing Date, the parties agree that the business of the Company shall be conducted only in the ordinary course, except that the signatories on the Company's bank accounts shall be changed such that each check written by the Company over $1,000.00 shall require the signature of a representative of Buyer and a representative of the Selling Stockholders. The Selling Stockholders and the Company shall use their best efforts between the date of this Agreement and the Closing Date to preserve the Company's business organization, to keep available the services of the Company's present officers and employees, and to preserve the good will of the Company's suppliers, customers and others having business relations with it. The Selling Stockholders and the Company shall afford to Buyer and its authorized representatives full access during normal business hours to all properties, books, records, contracts and documents of the Company and a full opportunity to make such reasonable investigations as they shall desire to make of the Company, and the Selling Stockholders and the Company shall furnish or cause to be furnished to Buyer and its authorized representatives all such information with respect to the affairs and businesses of the Company as Buyer may reasonably request.



<PAGE>

(c) At the Closing, in addition to any other instruments or documents referred to herein:

(i) The Selling Stockholders shall deliver to Buyer, free and clear of any lien, claim or encumbrance, certificates representing the Company Shares, duly endorsed in blank or with duly executed stock powers attached; and

(ii) Each of the Selling Stockholders shall deliver to Buyer a Subscription Agreement in the form of Exhibit A attached hereto (the "Subscription Agreement"); and

(iii) Buyer shall deliver a Warrant Agreement to each of the Selling Stockholders in the form of Exhibit B (the "Warrant Agreement"); and

(iv) Buyer and each of Joel Stalder ("Stalder") and Kevin Quaintance ("Quaintance") shall enter into a Consulting and Non-Competition Agreement in the form of Exhibit C hereto (the "Consulting Agreement"); and

(v) The Selling Stockholders shall deliver an Opinion of Counsel in the form of Exhibit D hereto; and

(vi) Buyer shall deliver the cash portion of the Purchase Price as directed herein payable on the Closing Date, and Buyer shall pay the Promissory Notes as directed herein.

4.A Representations and Warranties of Stalder and Quaintance. Stalder and Quaintance, each individually, jointly and severally represent and warrant to Buyer as follows:

(a) Existence; Good Standing; Corporate Authority; Compliance With Law. The Company is a corporation duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation. The Company is duly licensed or qualified to do business as a foreign corporation and is in good standing under the laws of all other jurisdictions in which the character of the properties owned or leased by it therein or in which the transaction of its business makes such qualification necessary. The states in which the Company is licensed or qualified to do business as a foreign corporation are listed on Schedule 4(a) hereof. The Company has all requisite corporate power and authority to own its properties and carry on its business as now conducted. The Company is not in default with respect to any order of any court, governmental authority or arbitration board or tribunal to which the Company is a party or is subject, and the Company is not in violation of any laws, ordinances, governmental rules or regulations to which it is subject. The Company has obtained all licenses, permits and other authorizations and has taken all actions required by applicable laws or governmental regulations in connection with its business as now conducted.



<PAGE>

(b) Validity and Effect of Agreements. This Agreement constitutes, and all agreements and documents contemplated hereby when executed and delivered pursuant hereto will constitute, the valid and legally binding obligations of the Selling Stockholders and the Company enforceable in accordance with their terms. The execution and delivery of this Agreement does not and the consummation of the transactions contemplated hereby will not (i) require the consent of any third party, (ii) result in the breach of any term or provision of, or constitute a default under, or result in the acceleration of or entitle any party to accelerate (whether after the giving of notice or the lapse of time or both) any obligation under, or result in the creation or imposition of any lien, charge, pledge, security interest or other encumbrance upon any part of the property of the Company pursuant to any provision of, any order, judgment, arbitration award, injunction, decree, indenture, mortgage, lease, license, lien, or other agreement or instrument to which the Selling Stockholders or the Company are a party or by which any of them is bound, or violate or conflict with any provision of the Bylaws or Articles of Incorporation of the Company as amended to the date of this Agreement.

(c) Capitalization. The Company has authorized capital stock as set forth on Schedule 4(c) of which those shares indicated on said Schedule 4 (c) as outstanding and no more are presently issued and outstanding. Except for rights granted pursuant to this Agreement, there are no outstanding rights, warrants, options, subscriptions, agreements or commitments giving anyone any right to require the Company to sell or issue, or the Selling Stockholders to sell, any capital stock or other securities. Except as set forth on Schedule 4(c) the Company has no subsidiaries and does not own nor or holds of record and/or beneficially any shares of any class in the capital of any other corporation or entity, and does not own any legal and/or beneficial interests in any partnerships, business trusts or joint ventures or in any other unincorporated trade or business enterprises.

(d) Records. The corporate minute books of the Company to be delivered to Buyer at the Closing Date shall contain true and complete copies of the Articles of Incorporation, as amended to the Closing Date, Bylaws, as amended to the Closing Date, and the minutes of all meetings of directors and shareholders and certificates reflecting all actions taken by the directors or shareholders without a meeting, from the date of incorporation of the Company to the Closing Date.

(e) Officers and Directors; Bank Accounts; Insurance. The officers and directors of the Company are as set forth in Schedule 4(e). Schedule 4(e) also sets forth (i) the name of each bank, savings institution or other person with which the Company has an account or safe deposit box and the names and

identification of all persons authorized to drawn thereon or to have access thereto, (ii) a list of all insurance policies owned by the Company, together with a brief statement of the coverage thereof. All of such policies of insurance are maintained with financially sound and reputable insurance companies, funds or underwriters and are of the kinds and cover such risks and



<PAGE>

are in such amounts and with such deductibles and exclusions as are consistent with prudent business practice. All such policies (a) are in full force and effect and (b) are sufficient for compliance by the Company with all requirements of law and all agreements to which the Company is a party. The Companies is not in default in any material respect with respect to its obligations under any of such insurance policies and has not received any notification of cancellation of any such insurance policies.

(f) Financial Statements. The unaudited balance sheet and notes thereto of the Company as of December 31, 2003 (hereinafter referred to as the "Year End Balance Sheet") and the unaudited balance sheet and notes thereto of the Company as of July 31, 2004 (hereinafter referred to as the "Most Recent Balance Sheet"), the unaudited statement of operations of the Company for the year ended December 31, 2003 (hereinafter referred to as the "Year End Financial Statement") and the unaudited statement of operations of the Company for the three and six months ended June 30, 2003 (hereinafter referred to as the "Most Recent Financial Statement") (collectively the "Financial Statements") fully and fairly set forth the financial condition of the Company as of the dates indicated, and the results of its operations for the periods indicated, in accordance with generally accepted accounting principles consistently applied, except as otherwise stated therein.

(g) Undisclosed Liabilities. Except as described on Schedule 4(g), the Company has no liabilities or obligations whatsoever, either accrued, absolute, contingent or otherwise, which are not reflected or provided for in the Financial Statements except (i) those arising after the date of the Most Recent Balance Sheet which are in the ordinary course of business, in each case in normal amounts and none of which is materially adverse; and (ii) which shall be disclosed to Buyer at Closing.

(h) Absence of Certain Changes or Events Since the Date of the Most Recent Balance Sheet. Except as described on Schedule 4(h), since the date of the Most Recent Balance Sheet, the Company has not:

(i) incurred any obligation or liability (fixed or contingent), except normal trade or business obligations incurred in the ordinary course of business and consistent with past practice, none of which is materially adverse, and except in connection with this Agreement and the transactions contemplated hereby;

(ii) discharged or satisfied any lien, security interest or encumbrance or paid any obligation or liability (fixed or contingent), other than in the ordinary course of business and consistent with past practice;

(iii) mortgaged, pledged or subjected to any lien, security interest or other encumbrance any of its assets or properties (other than mechanic's, materialman's and similar statutory liens arising in the ordinary course of business and purchase money security interests arising as a matter of law between the date of delivery and payment);



<PAGE>

(iv) transferred, leased or otherwise disposed of any of its assets or properties except for a fair consideration in the ordinary course of business and consistent with past practice or, except in the ordinary course of business and consistent with past practice, acquired any assets or properties;

(v) canceled or compromised any debt or claim, except in the ordinary course of business and consistent with past practice;

(vi) waived or released any rights of material value;

(vii) except pursuant to those contracts listed on Schedule 4(n) hereto, transferred or granted any rights under any concessions,

leases, licenses, agreements, patents, inventions, trademarks, trade names, service marks or copyrights or with respect to any know-how;

(viii) made or granted any wage or salary increase to any employee, entered into any employment contract with, or made any loan to, or entered into any material transaction of any other nature with, any officer or employee of the Company;

(ix) entered into any material transaction, contract or commitment, except (i) contracts listed on Schedule 4(n) hereto and (ii) this Agreement and the transactions contemplated hereby;

(x) suffered any casualty loss or damage (whether or not such loss or damage shall have been covered by insurance) which affects in any material respect its ability to conduct business; or

(xi) declared any dividends or bonuses, or authorized or affected any amendment or restatement of the Articles of Incorporation or Bylaws of the Company or taken any steps looking toward the dissolution or liquidation of the Company.

Between the date of this Agreement and the Closing Date, Stalder and Quaintance will not cause the Company to do, without the prior written consent of Buyer, any of the things listed in subsections (i) through (xi) above.

(i) Taxes. The Company (i) has duly and timely filed or caused to be filed all federal, state, local and foreign tax returns (including, without limitation, consolidated and/or combined tax returns) required to be filed by it prior to the date of this Agreement which relate to the Company or with respect to which the Company or the assets or properties of the Company are liable or otherwise in any way subject, (ii) has paid or fully accrued for all taxes shown



<PAGE>

to be due and payable on such returns (which taxes are all the taxes due and payable under the laws and regulations pursuant to which such returns were filed), and (iii) has properly accrued for all such taxes accrued in respect of the Company or the assets and properties of the Company for periods subsequent to the periods covered by such returns. No deficiency in payment of taxes for any period has been asserted by any taxing body and remains unsettled at the date of this Agreement.

(j) Title to Company Shares. The Shares are duly authorized, validly issued, fully paid and nonassessable.

(k) Title to Property and Assets. The Company has good and marketable title to all of the properties and assets used by it in the conduct of its business (including, without limitation, the properties and assets reflected in the Financial Statements and those listed on Schedule 4(k) hereto, except any thereof since disposed of for value in the ordinary course of business) and none of such properties or assets is, except as disclosed in the Financial Statements, subject to a contract of sale not in the ordinary course of business, or subject to security interests, mortgages, encumbrances, liens or charges of any kind or character.

(l) Condition of Personal Property. All tangible personal property, equipment, fixtures and inventories included within the assets of the Company or required to be used in the ordinary course of business are in good, merchantable or in reasonably repairable condition and are suitable for the purposes for which they are used. No value in excess of applicable reserves has been given to any inventory with respect to obsolete or discontinued products. All of the inventories and equipment, including equipment leased to others, are well maintained and in good operating condition.

(m) Real Estate. Schedule 4(m) contains a list of all real property owned by the Company or in which the Company has a leasehold or other interest and of any lien, charge or encumbrance thereupon. Schedule 4(m) also contains a substantially accurate description identifying all such real property and the significant rental terms (including rents, termination dates and renewal conditions). The improvements upon such properties and use thereof by the Company conform to all applicable lease restrictions, zoning and other local ordinances. The Company: (i) has not caused any releases of any Hazardous Substance (as defined herein) anywhere which requires remediation or clean-up pursuant to any Environmental Law (as defined herein), and (ii) has not disposed of Hazardous Substances anywhere except in compliance in all material respects

with applicable Environmental Laws. The Company not has conducted or engaged in any operation or activity involving the use, storage or disposal of any Hazardous Substance except as authorized by applicable Environmental Laws. There is no pending or threatened, lawsuit, action, claim or proceeding by any third party alleging or asserting that either Company has violated or is about to violate any applicable Environmental Law. "Environmental Law" shall be defined as any judgment, decree, order, law, license, permit, rule or regulation pertaining to environmental matters, including, without limitation, those arising under the Resource Conservation and Recovery Act ("RCRA"), the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as



<PAGE>

amended ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), the Federal Water Pollution Control Act, the Solid Waste Disposal Act, as amended, the Federal Clean Water Act, the Federal Clean Air Act, the Toxic Substances Control Act, or any state or local statute, regulation, ordinance, order or decree relating to health, safety or the environment. Hazardous Substance shall be defined as any hazardous waste, as defined by 42 U.S.C. 6903(5), any hazardous substance as defined by 42 U.S.C. 9601(14), any pollutant or contaminant as defined by 42 U.S.C. 9601(33) or any toxic substance, oil or hazardous material or other chemical or substance regulated by any Environmental Laws.

(n) List of Contracts and Other Data. Schedule 4(n) sets forth the following:

(i) all patents and registrations for trademarks, trade names, service marks and copyrights which are unexpired as of the date of this Agreement and which are used in connection with the operation of the Company's business, as well as all applications pending on said date for patents or for trademark, trade name, service mark or copyright registrations, and all other proprietary rights, owned or held by the Company and which are reasonably necessary to, or used in connection with, the business of the Company,

(ii) all licenses granted by or to the Company and all other agreements to which the Company is a party and which relate, in whole or in part, to any items of the categories mentioned in (i) above or to other proprietary rights of the Company which are reasonably necessary to, or used in connection with, the business of the Company;

(iii) all contracts, understandings and commitments (including, without limitation, mortgages, indentures and loan agreements) to which the Company is a party, or to which it or any of its assets or properties are subject and which are not specifically referred to in subsections (i) ir (ii) above.

(v) the names and current annual compensation rates of all management employees of the Company; and

(vi) all customer backlog which is represented by firm purchase orders, identifying the customers, products and purchase prices.

True and complete copies of all documents and complete descriptions of all oral understandings, if any, referred to in this Section 4(n) have been provided or made available to Buyer and his counsel.

(o) Business Property Rights. (i) The property referred to in Section 4(n)(i) above, together with all designs, methods, inventions and know-how related thereto and all trademarks, trade names, service marks, and copyrights claimed or used by the Company which have not been registered (collectively



<PAGE>

"Business Property Rights"), constitute all such proprietary rights owned or held by the Company and which are reasonably necessary to, or used in the conduct of the business of the Company. The computer software and all related designs, methods, inventions and know-how constitute trade secrets of the Company within the meaning of all applicable laws, and the Company has taken all necessary steps required by law to protect these trade secrets as such. The Company owns or has valid rights to use all such Business Property Rights

without conflict with the rights of others. No person or corporation has made or threatened to make any claims that the operation of the business of the Company is in violation of or infringes any Business Property Rights or any other proprietary or trade rights of any third party. No third party is in violation of or is infringing upon any Business Property Rights.

(p) No Breach or Default. Except as described on Schedule 4(p), the Company is not in default under any contract to which it is a party or by which it is bound, nor has any event occurred which, after the giving of notice or the passage of time or both, would constitute a default under any such contract. the Selling Stockholders have no reason to believe that the parties to such contracts will not fulfill their obligations under such contracts in all material respects or are threatened with insolvency.

(q) Labor Controversies. Schedule 4(q) sets forth the following:

(i) the names and current annual compensation rates of all employees of the Company; and

(ii) all collective bargaining agreements, employment and consulting agreements, executive compensation plans, bonus plans, profit-sharing plans, deferred compensation agreements, employee pension or retirement plans, employee stock purchase and stock option plans, group life insurance, hospitalization insurance or other plans or arrangements providing for benefits to employees of the Company;

The Company is not a party to any collective bargaining agreement. There are not any controversies between the Company and any of its employees which might reasonably be expected to materially adversely affect the conduct of its business, or any unresolved labor union grievances or unfair labor practice or labor arbitration proceedings pending or threatened relating to its business, and there are not any organizational efforts presently being made or threatened involving any of the Company's employees. The Company has not received notice of any claim that the Company has not complied with any laws relating to the employment of labor, including any provisions thereof relating to wages, hours, collective bargaining, the payment of social security and similar taxes, equal employment opportunity, employment discrimination and employment safety, or that the Company is liable for any arrears of wages or any taxes or penalties for failure to comply with any of the foregoing.



<PAGE>

(r) Litigation. There are no actions, suits or proceedings with respect to the Company involving claims by or against the Selling Stockholders or the Company which are pending or threatened against any of them, whether individually or jointly, at law or in equity, or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality. No basis for any action, suit or proceeding exists, and there are no orders, judgments, injunctions or decrees of any court or governmental agency with respect to which the Company has been named or to which the Company is a party, which apply, in whole or in part, to the business of the Company, or to any of the assets or properties of the Company or which would result in any material adverse change in the business or prospects of the Company.

(s) Potential Conflicts of Interest. No officer, director or stockholder of the Company or any affiliate of any of them (a) owns, directly or indirectly, any interest in (excepting not more than five percent (5%) stock holdings for investment purposes in securities of publicly held and traded companies) or is an officer, director, employee or consultant of any person or entity which is a competitor, lessor, lessee, customer or supplier of the Company; (b) owns, directly or indirectly, in whole or in part, any tangible or intangible property which the Company is using or the use of which is necessary for the business of the Company; or (c) has any cause of action or other claim whatsoever against, or owes any amount to, the Company, except for claims in the ordinary course of business, such as for accrued vacation pay, accrued benefits under employee benefit plans and similar matters and agreements.

(t) Suppliers and Customers. Schedule 4(t) lists all of the suppliers and all of the customers the Companies during each of the last two fiscal years. The relationships of the applicable Company with such suppliers and customers are good commercial working relationships and, except as set forth on Schedule 4(t), no supplier or customer of material importance to the Company has cancelled or otherwise terminated threatened to cancel or otherwise to terminate, its relationship with the Company, or has during the last twelve (12) months

decreased materially, or threatened to decrease or limit materially, its services, supplies or materials for use by the Company or its usage or purchase of the services or products of the Company except for normal cyclical changes related to customers' businesses. No such supplier or customer intends to cancel or otherwise substantially modify its relationship with Company or to decrease materially or limit its services, supplies or materials to Company, or its usage or purchase of the services of the Company, and, the communication of the transactions contemplated hereby will not materially adversely affect the relationship of Buyer with any such supplier or customer.

(u) Accounts Receivable. All accounts and notes receivable reflected on the Most Recent Balance Sheet, and all accounts and notes receivable arising subsequent to the date of the Most Recent Balance Sheet, have arisen in the ordinary course of business, represent valid obligations owing to the Company and have been collected or are collectible in the aggregate recorded amounts thereof in accordance with their terms.

(v) Broker. Neither the Selling Stockholders nor any affiliate of the Selling Stockholders has retained, utilized or been represented by any broker, agent, finder or intermediary in connection with the negotiation or consummation of the transactions contemplated by this Agreement.



<PAGE>

(w) No Misrepresentation or Omission. No representation or warranty by Quaintance or Stalder or the Selling Stockholders in this Section 4 or in any other Section of this Agreement, or in any certificate or other document furnished or to be furnished by Quaintance, Stalder or the Selling Stockholders pursuant hereto, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to provide Buyer with accurate information as to the Company. The representations of Stalder, Quaintance or the Selling Stockholders made in writing in connection with the transactions contemplated hereby (in each case except as affected by the transactions contemplated by this Agreement) shall survive the Closing and the transactions contemplated hereby.

4B. Representations and Warranties of the Selling Stockholders. The Selling Stockholders represent and warrant, with respect to the Shares owned by them respectively:

(a) Title to Company Shares. The Shares are owned by the respective Selling Stockholder, free and clear of all liens, encumbrances, charges, assessments and adverse claims. The Shares are subject to no restrictions with respect to transferability to Buyer in accordance with the terms of this Agreement. Upon transfer of the Shares by the respective Selling Stockholder, Buyer will, as a result, receive good and marketable title to all of the Company Shares, free and clear of all security interests, liens, encumbrances, charges, assessments, restrictions and adverse claims.

4C. Representations and Warranties of Buyer.

(a) Existence; Good Standing; Corporate Authority; Compliance With Law. The Company is a corporation duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation.

(b) Validity and Effect of Agreements. This Agreement constitutes, and all agreements and documents contemplated hereby when executed and delivered pursuant hereto will constitute, the valid and legally binding obligations of Buyer enforceable in accordance with their terms. The execution and delivery of this Agreement does not and the consummation of the transactions contemplated hereby will not (i) require the consent of any third party, (ii) result in the breach of any term or provision of, or constitute a default under, or result in the acceleration of or entitle any party to accelerate (whether after the giving of notice or the lapse of time or both) any obligation under, or result in the creation or imposition of any lien, charge, pledge, security interest or other encumbrance upon any part of the property of Buyer pursuant to any provision of, any order, judgment, arbitration award, injunction, decree, indenture, mortgage, lease, license, lien, or other agreement or instrument to which Buyer is a party or by which any of them is bound, or violate or conflict with any provision of the Bylaws or Articles of Incorporation of the Buyer as amended to the date of this Agreement (other than agreements requiring to the increase in the authorized shares of the Buyer's common stock, for which approval of Buyer's shareholders is required.

<PAGE>

5. Buyer's Conditions of Closing. The obligation of Buyer to purchase and pay for the Shares shall be subject to and conditioned upon the satisfaction at the Closing of each of the following conditions:

(a) All representations and warranties of the Selling Stockholders contained in this Agreement and the Schedules hereto shall be true and correct at and as of the Closing Date, the Selling Stockholders shall have performed all agreements and covenants and satisfied all conditions on their part to be performed or satisfied by the Closing Date pursuant to the terms of this Agreement, and Buyer shall have received a certificate of the Selling Stockholders dated the Closing Date to such effect.

(b) There shall have been no material adverse change since the date of the Most Recent Balance Sheet in the financial condition, business or affairs of the Company, the Company shall not have suffered any material loss (whether or not insured) by reason of physical damage caused by fire, earthquake, accident or other calamity which substantially affects the value of its assets, properties or business, and Buyer shall have received a certificate of the Selling Stockholders dated the Closing Date to such effect.

(c) The Selling Stockholders shall have delivered to Buyer a Certificate of the Secretary of State of the state of incorporation of the Company and any other States, if any, listed on Schedule 4(a) certifying as of a date reasonably close to the Closing Date that the Company has filed all required reports, paid all required fees and taxes, and is, as of such date, in good standing and authorized to transact business as a domestic corporation.

(d) The Selling Stockholders shall have delivered his written resignation, effective on the Closing Date, as a member of the Board of Directors, officer or employee of the Company, as appropriate.

(e) The Selling Stockholders shall have delivered to Buyer certificates and other instruments representing the Shares to be purchased by Buyer, duly endorsed for transfer or accompanied by appropriate stock powers, together with all other documents necessary or appropriate to validly transfer the Shares to Buyer free and clear of all security interests, liens, encumbrances and adverse claims.

(f) Quaintance and Stalder shall have executed and delivered to Buyer a Consulting and Non-Competition Agreement in the form attached hereto as Exhibit C and a Subscription Agreement in the form attached hereto as Exhibit A.



<PAGE>

(g) The Selling Stockholders shall have executed and delivered to Buyer a release of (i) any and all claims that the Selling Stockholders may have to any profits of the Company for any period prior to the Closing Date and (ii) any and all claims the Selling Stockholders may have against the Company for services provided to Company for any period prior to the Closing Date.

(h) Buyer shall have received from counsel for the Selling Stockholders, an opinion dated the Closing Date, in the form attached hereto as Exhibit D.

(i) Buyer shall have received from the Selling Stockholders all of the reasonable items required by the Selling Stockholders to conduct a thorough due diligence review of the Company, and Buyer shall be satisfied in all respects with the results of said review in its sole discretion;

(j) Neither any investigation of the Company nor the Schedules attached hereto or any supplement thereto nor any other document delivered to Buyer as contemplated by this Agreement, shall have revealed any facts or circumstances which, in the sole and exclusive judgment of Buyer and regardless of the cause thereof, reflect in an adverse way on the Company or its financial condition, assets, liabilities (absolute, accrued, contingent or otherwise), reserves, business, operations or prospects.

(k) The Selling Stockholders shall have delivered to Buyer the approval and all consents from third parties and governmental agencies required to consummate the transactions contemplated hereby, including, without limitation, those consents listed on Schedule 4(k) hereto.

(l) No suit, action, investigation, inquiry or other proceeding by any

governmental body or other person or legal or administrative proceeding shall have been instituted or threatened which questions the validity or legality of the transactions contemplated hereby.

(m) As of the Closing Date, there shall be no effective injunction, writ, preliminary restraining order or any order of any nature issued by a court of competent jurisdiction directing that the transactions provided for herein or any of them not be consummated as so provided or imposing any conditions on the consummation of the transactions contemplated hereby, which is unduly burdensome on the Company.

(n) The Selling Stockholders shall have delivered to Buyer such unaudited financial statements and other information in customary form as shall be reasonably required by Buyer, its independent public accountants, The Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission pursuant to said statutes.



<PAGE>

6. The Company's and Selling Stockholder's Conditions of Closing. The obligation of the Selling Stockholders to sell the Shares shall be subject to and conditioned upon the satisfaction at the Closing of each of the following conditions:

(a) All representations and warranties of Buyer contained in this Agreement shall be true and correct at and as of the Closing Date, Buyer shall have performed all agreements and covenants and satisfied all conditions on its part to the performed or satisfied by the Closing Date pursuant to the terms of this Agreement, and the Selling Stockholders shall have received a certificate of Buyer dated the Closing Date to such effect.

(b) The Company shall have executed and delivered to Quaintance and Stalder a Consulting and Non-Competition Agreement in the form attached hereto as Exhibit C, as well as a Subscription Agreements in the form attached hereto as Exhibit A and Warrant Agreements in the form attached as Exhibit B to each of the Selling Stockholders.

(c) The approval and all consents from third parties and governmental agencies required to consummate the transactions contemplated hereby shall have been obtained.

(d) No suit, action, investigation, inquiry or other proceeding by any governmental body or other person or legal or administrative proceeding shall have been instituted or threatened which questions the validity or legality of the transactions contemplated hereby.

(e) As of the Closing Date, there shall be no effective injunction, writ, preliminary restraining order or any order of any nature issued by a court of competent jurisdiction directing that the transactions provided for herein or any of them not be consummated as so provided or imposing any conditions on the consummation of the transactions contemplated hereby, which is unduly burdensome on the Selling Stockholders.

7. Consents and Approvals of Parties. (a) Each of the parties to this Agreement hereby consents to the transactions contemplated by this Agreement and hereby waives any right that any of the parties to this Agreement may have to object to the transactions contemplated by this Agreement or to claim any preemptive or other right by reason of such transactions, under any agreement or under the By-laws or the Articles of Incorporation of the Company.

(b) The Selling Stockholders, in their respective capacities as shareholders and/or directors of the Company, hereby approve and authorizes the transactions contemplated by this Agreement with the same effect as if these transactions were unanimously approved by the shareholders and Board of Directors of the Company at separate meetings of the shareholders and Board of Directors specially convened for that purpose.



<PAGE>

8. Indemnification. (a) The Selling Stockholders, individually, jointly and severally agree to indemnify and hold harmless Buyer and the Company against (i) any payment, loss, cost or expense (including reasonable attorney's fees) made

or incurred by or asserted against Buyer and/or the Company at any time after the Closing Date in respect of any omission, misrepresentation, breach of warranty, or non-fulfillment of any term, provision, covenant or agreement on the part of the Selling Stockholders contained in this Agreement, or from any misrepresentation in, or omission from, any certificate or other instrument furnished or to be furnished pursuant to this Agreement; (ii) any actual or alleged liability (including, without limitation, any liability or alleged liability for cleanup, removal, remediation or other response costs or for death or injury to person or property) arising from (x) the violation by the Selling Stockholders or the Company of any Environmental Law on or prior to the Closing Date, (y) the release, emission, discharge or presence on or prior to the Closing Date of any Hazardous Substance, toxic pollutants or other chemical by-products onto, from or into any real property presently or formerly owned, leased or operated by the Selling Stockholders or the Company or any affiliate thereof or any predecessors in interest of any of them, or (z) the transportation by the Selling Stockholders or the Company or their subcontractors of any Hazardous Substance, toxic pollutant or other chemical by-product; (iii) any claim under or pursuant to any employee benefit plan or any liability under ERISA or the Internal Revenue Code with respect to any employee benefit plan or other benefit plan of any person that at any time prior to the Closing Date an employee or provided service to the Company; (iv) any claims for worker's compensation relating to the period prior to the Closing Date.

(b) Buyer agrees to indemnify and hold harmless the Selling Stockholders against any payment, loss, cost or expense (including reasonable attorney's fees) made or incurred by or asserted against the Selling Stockholders at any time after the Closing Date in respect of any omission, misrepresentation, breach of warranty, or non-fulfillment of any term, provision, covenant or agreement on the part of Buyer contained in this Agreement, or from any misrepresentation in, or omission from, any certificate or other instrument furnished or to be furnished pursuant to this Agreement

9. Termination and Abandonment. (a) The transactions contemplated herein may be terminated and/or abandoned at any time before or after approval thereof by the Company, Selling Stockholders or Buyer, but not later than the Closing Date:

(i) by mutual consent of the Company, Selling Stockholders and Buyer;

(ii) by Buyer on or before the Closing Date if any of the conditions provided for in Section 5 hereof for the benefit of such party shall not have been met and it appears reasonably likely in Buyer's sole and exclusive judgment that said condition cannot be met within a reasonable time;



<PAGE>

(iii) by the Company or Selling Stockholders on or before the Closing Date if any of the conditions provided for in Section 6 hereof for the benefit of such party shall not have been met on or before the date thirty (30) days following the date the Selling Stockholders shall have delivered to Buyer all of the documents and other information required under Section 5 hereof and it appears reasonably likely in Company's or Selling Stockholders' sole and exclusive judgment that said condition cannot be met within a reasonable time thereafter

(b) In the event of termination and/or abandonment by the Company, Selling Stockholders or Buyer, or all of them, pursuant to subsection (a) above, written notice thereof shall forthwith be given to the other party and the transactions contemplated by this Agreement shall be terminated and/or abandoned, without further action the Company, Selling Stockholders or Buyer. If the transactions contemplated by this Agreement are terminated and/or abandoned as provided herein, no party hereto shall have any liability or further obligation to any other party to this Agreement.

10. Attorneys' Fees. Selling Stockholders and Buyer shall each be responsible for his or its own attorneys' fees in connection with the negotiation and preparation of this Agreement.

11. Further Assurances. The parties from time to time shall execute and deliver such additional documents and instruments and take such additional actions as may be necessary to carry out the transactions contemplated in this Agreement.

12. Binding Effect. Subject to the provisions of this Section, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns, heirs, executors and administrators; provided, however, that except as expressly provided in this Section neither party may assign its rights or delegate its obligations hereunder without the consent of the other parties.

13. Confidentiality. Each party agrees that disclosure of the terms of this Agreement would be prejudicial to the interests of the parties hereto. Accordingly, each party agrees not to disclose the terms of this Agreement or the nature of any disputes or proceedings under this Agreement except to the extent required by law, as may be necessary to enforce such party's rights hereunder, for a party to obtain or renew bank financing, or as may be required by generally accepted accounting principles, in the opinion of Buyer's independent certified public accountant, in Buyer's financial statements or the notes thereto.

14 Exclusive Dealing. In consideration of the payment by Buyer to the Selling Stockholders of a $10,000 non refundable deposit, neither the Selling Stockholders nor any of Company's officers or directors, directly or indirectly, through any representative or otherwise, will solicit or entertain offers from, negotiate or in any manner encourage, discuss, accept or consider any proposal from any other person relating to the acquisition, in whole or in part, of the assets of the Company, or its business whether directly or indirectly, through purchase, merger, consolidation, or otherwise. The Company will notify Buyer, immediately upon learning thereof, regarding any contact between the Company and their representatives or other person regarding any such offer or proposal.



<PAGE>

15 Disclosure Of Information

(a) The Selling Stockholders acknowledge that, in the course of its relationship with Seller, they have had access certain confidential and/or non-public information pertaining to the Company, including without limitation, trade secrets, know-how, formulas, marketing plans, financial information, processes, policies, formulas, creations, designs, materials, techniques, patents, technologies, compositions, improvements, ideas, specifications, or other information relating to Seller. All information, and all documents, records, notebooks, drawings, photographs, and any repositories or representations of such information, in whatever form or media, and whether or not specifically labeled confidential, are hereinafter referred to as "Confidential Information". The Selling Stockholders, on behalf of themselves and each of their respective employees, agents, representatives, and affiliate, agrees that from the date hereof keep secret and confidential and shall not in any manner disclose or exploit any Confidential Information other than to those specific individuals who are required to obtain such Confidential Information for the purpose of performing their obligations under this Agreement. The Selling Stockholders agree that they, and their respective employees, agents, representatives, and affiliates will hold in strict trust and confidence all such Confidential Information, that neither they nor any of their respective employees, agents, representatives, or affiliates will use such Confidential Information for any purposes whatsoever other than in the course of performance of their respective obligations under this Agreement. Neither the Selling Stockholders nor any of their respective employees, agents, representatives or affiliates shall copy, reproduce, sell, reveal, use or otherwise disclose any such Confidential Information to any persons or entity whatsoever except in the course of performance of their respective obligations under this Agreement.

(b) Upon consummation of the transaction contemplated by this Agreement, each of the Selling Stockholders shall provide Buyer with all lists, books, records, files, documents, forms and similar items, and all copies thereof in its possession, which contain any Confidential Information. In addition, each of the Selling Stockholders shall delete all Confidential Information from any all computers, disks, tapes, hard drives, or other electronic or magnetic media in whatever form within his possession or control (collectively, "Computers"). Upon consummation of the transaction contemplated by this Agreement, each of the Selling Stockholders shall warrant, represent and certify that they have (i) not and will not use any Confidential Information other than in the course of their relationship with Buyer, (ii) deleted all Confidential Information from all Computers and (iii) returned to Buyer all paper or other hard copies of any and all Confidential Information in its possession or control.

(c) Each of the Selling Stockholders acknowledge that any breach by any of

them or their respective employees, agents, representatives, or affiliates, of any provision of this Agreement, including, without limitation, the provisions of Sections 15 or 16 of this Agreement, would cause great and irreparable harm to Buyer, which harm could not reasonably be reduced to monetary damages. Accordingly, in addition to whatever other rights Buyer may have in the event of such breach, Buyer shall have the right to specific performance or an injunction or similar relief prohibiting further breach of this Agreement by the Selling Stockholders or their respective employees, agents or representatives, or affiliates.



<PAGE>

16 Non-Competition

(a) For a period of one (1) year following the Closing Date, the Selling Stockholders will not, as a principal, agent, employee, consultant, officer, director, investor, joint venture participant or partner of any person, firm, corporation or business entity other than ICOA, directly or indirectly, without the express prior written consent of ICOA: (1) engage or participate in any business whose products or services are competitive with that that of the Company; (2) aid or counsel any other person, firm, corporation or business entity to do any of the above; (3) become engaged by a firm, corporation, partnership or joint venture which competes with the business of the Company; or (4) approach, solicit business from, or otherwise do business or deal with any customer of the Company in connection with any product or service competitive to any provided by the Company.

(b) For a period of two (2) years following the Closing Date, the Selling Stockholders will not solicit, encourage, or cause others to solicit or encourage any employees, independent contractors, or clients of the Company to terminate their employment, contractual, or client relationship with the Company or Buyer.

(iv) Each of the Selling Stockholders believe that the restrictions placed on them, in the light of all the consideration paid and circumstances surrounding this transaction and the nature of Buyer's and the Company's business, are reasonable as to scope, period of time and geographical area. Nevertheless, it is the intent of the parties that this Agreement be enforceable and restrict the Selling Stockholders only to the extent permitted by law. In the event any court of competent jurisdiction finds any provision of this Agreement unlawfully onerous or oppressive, the parties will stipulate and agree to such modification of the terms of this Agreement as such court shall consider appropriate and shall not claim that this Agreement is void or voidable.

17 Miscellaneous. (a) Any notice given hereunder shall be in writing and shall be conclusively presumed to have been given when delivered by hand or when deposited in the United States mail, certified mail, return receipt requested, postage prepaid, addressed to the parties at the addresses indicated in this Agreement. The address of any party hereto may be changed by giving notice thereof to all other parties hereto at any time.

(b) This Agreement constitutes the entire agreement between the parties and supersedes all prior negotiations, understanding and agreements concerning the subject matter hereof. No modification hereof shall be binding upon any party unless in writing and signed by or on behalf of the party against which the modification is asserted.



<PAGE>

(c) Waiver of any provision hereof must be in writing signed by the party to be charged with the effect thereof. Waiver of any default or breach of this Agreement shall not be deemed a waiver of any other default or breach.

(d) All section headings herein shall be only for purposes of reference and shall have no substantive significance.

(e) This Agreement shall be governed by and construed in accordance with the laws of the State of Rhode Island. Each of the parties hereto, as to any legal action or proceeding arising out of or based upon this Agreement, (i) hereby submits to the jurisdiction of, and waives all objections to venue in, the courts of the State of Rhode Island, the United States District

Court for the District of Rhode Island and any court from which an appeal might be taken from such courts and (ii) agrees that in the event that service cannot be made upon him or it in any such proceeding by personal service within the State of Rhode Island, service may be effected by mail to him or it in the same manner as notices are required to be given to him or it under subsection (a) above.

(f) Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable laws; should any portion of this Agreement be declared invalid for any reason in any jurisdiction, such declaration shall have no effect upon the remaining portions of this Agreement, furthermore, the entirety of this Agreement shall continue in full force and effect in all other jurisdictions and said remaining portions of this Agreement shall continue in full force and effect in the subject jurisdiction as if this Agreement had been executed with the invalid portions thereof deleted.

(g) All of the terms, conditions, warranties and representations contained in this Agreement shall survive, in accordance with their terms, delivery by the Selling Stockholders of the consideration to be given by him hereunder and delivery by Buyer of the consideration to be given by them hereunder, and shall survive the execution hereof and the Closing hereunder.

(h) All notices, demands and other communications hereunder shall be in writing or by written telecommunication, and shall be deemed to have been duly given if delivered personally or if mailed by certified mail, return receipt requested, postage prepaid, or if sent by overnight courier, or sent by written telecommunication, as follows:



<PAGE>

If to the Selling Stockholders, to:

Kevin Quaintance
AuthDirect, Inc.
467 Saratoga Ave, # 105
San Jose, CA 95129

FAX NO: ______________

With a copy sent contemporaneously to:

Theresa M. Mehringer, Esq.
Burns Figa & Will, P.C.
6400 S. Fiddlers Green Circle, Ste 1030
Englewood, CO 80111

FAX NO: 303-796-2777

If to the Buyer, to:

George Strouthopoulos, President
ICOA, Inc.
111 Airport Road
Warwick RI 02889

FAX NO: 401-739-9215

With a copy sent contemporaneously to:

Francis D. Parisi, Esq.
202 Broadway
Providence, RI 02903

FAX NO: 401-831-8387

Any such notice shall be effective (a) if delivered personally, when received, (b) if sent by overnight courier, when receipted for, (c) if mailed, three (3) days after being mailed as described above, and (d) if sent by written telecommunication, when dispatched.

(remainder of page left intentionally blank)



<PAGE>

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

BUYER:

ICOA, Inc.

By:_________________________
George Strouthopoulos, President

COMPANY:
AUTHDIRECT, INC.

By:_________________________
Kevin Quaintance, President

SELLING SHAREHOLDERS:

-----------------------
Kevin Quaintance

-----------------------
Joel Stalder

-----------------------
Gordon Townsend

-----------------------
Geoffrey Maness

-----------------------
Adam Sewall

-----------------------
Glenda Donate

-----------------------
Jason TeWhau



<PAGE>

INDEX TO SCHEDULES

Schedule 2(a) Distribution of Purchase Price

Schedule 2(b) Payment of Promissory Notes

1) Promissory Note payable to Kevin Quaintance in the amount of $40,000 payable in six (6) payments as follows:
Payment of $ 5,000 at closing;
Payment of $ 5,000 within fifteen (15) days from closing;
Payment of $ 5,000 within forty five (45) days from closing;
Payment of $ 5,000 within seventy five (75) days from closing;
Payment of $ 5,000 within one hundred and five (105) days from closing;
Payment of $ 7,500 within one hundred and thirty five (135) days from closing;
Payment of $ 7,500 within one hundred and sixty five (165) days from closing.

2) Promissory Note payable to Joel Stalder in the amount of $40,000 payable in six (6) payments as follows:
Payment of $ 5,000 at closing;
Payment of $ 5,000 within fifteen (15) days from closing;
Payment of $ 5,000 within forty five (45) days from closing;
Payment of $ 5,000 within seventy five (75) days from closing;
Payment of $ 5,000 within one hundred and five (105) days from closing;
Payment of $ 7,500 within one hundred and thirty five (135) days from closing;
Payment of $ 7,500 within one hundred and sixty five (165) days from closing.

| | |
|---|---|
| Schedule 4(a) | Foreign State Qualifications |
| Schedule 4(c) | Capitalization, Subsidiaries |
| Schedule 4(e) | Officers and Directors, Bank Accounts, Insurance, etc. |
| Schedule 4(k) | Asset List |
| Schedule 4(m) | Real Estate |
| Schedule 4(n) | Contracts and Other Data |
| Schedule 4(q) | Employees, Compensation, Benefit Plans, etc. |
| Schedule 4(t) | Suppliers and Customers |
| Schedule 5(k) | Required Consents |




<PAGE>

INDEX TO EXHIBITS


| | |
|---|---|
| Exhibit A | Form of Subscription Agreement |
| Exhibit B | Form of Warrant Agreement |
| Exhibit C | Form of Consulting and Non-Competition Agreement |




<PAGE>

Schedule 4(c)

Capitalization

State of Incorporation: California

Authorized Shares: 100,000 Shares of Common Stock, no par value per share

Total Shares Issued: 100,000 Shares

| Shareholder | Total Shares Owned | Percentage of Outstanding Owned |
|---|---|---|
| Kevin Quaintance | 43,000 | 43.00% |
| Joel Stalder | 43,000 | 43.00% |
| Gordon Townsend | 4,000 | 4.00% |
| Geoffrey Maness | 2,000 | 2.00% |
| Adam Sewall | 500 | 0.50% |
| Glenda Donate | 5,000 | 5.00% |
| Jason TeWhau | 2,500 | 2.50% |

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-16.3
<SEQUENCE>4
<FILENAME>ex163.txt
<DESCRIPTION>CONSULTING AGREEMENT
<TEXT>

INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement ("Agreement") is between ICOA, INC. ("Company"), with its principal place of business at 111 Airport Rd. Warwick, RI 02889 and Kevin Quaintance ("Contractor").

In consideration of the agreements set forth below, the parties agree as follows:

1.0 SCOPE OF SERVICES

Contractor shall furnish services to the Company as described in Exhibit A, attached hereto and incorporated herein by this reference (the "Services"). Contractor shall determine the method, details and means of performing the Services.

2.0 TERM

The Effective Date of the Agreement shall be September 8, 2004.

The term of this Agreement ("Term") shall commence on the Effective Date and shall continue through December 1, 2004 unless terminated by either party pursuant to paragraph 7 or extended by written mutual agreement of the parties.

3.0 CONSIDERATION

Company shall pay to Contractor, as consideration for Contractor's complete performance of the Services the amount or rate specified in Exhibit A. Contractor shall bill Company monthly, with payment to be made within thirty days of receipt of the invoice from Contractor. Contractor shall be responsible for all expenses incurred in association with the performance of the Services.

4.0 TAXES

Contractor shall have sole responsibility for payment of any and all taxes incurred as a result of Contractor's compensation hereunder, including but not limited to, estimated, foreign, federal, state, and local taxes or contributions imposed or required under unemployment insurance, social security and income tax laws and for filing all required tax forms with respect to any amounts paid by Company to Contractor hereunder. Contractor further agrees to provide Company with proof of such payments upon demand. Contractor shall indemnify and hold Company harmless against any claim of liability, including penalties, damages or injuries suffered by Company resulting from failure of Contractor to pay such taxes or contributions, or failure of Contractor to file any such tax forms.



<PAGE>

5.0 INVENTIONS, CREATIONS, IMPROVEMENTS OR OTHER DEVELOPMENTS

Contractor shall disclose and does hereby assign to Company, its successors and assigns, any and all inventions, creations, improvements, or other developments, each whether patentable, copyrightable or not, which Contractor may hereafter make or assist in making and which result from the Services performed under this Agreement. Contractor hereby assigns to Company, its successors or assigns, any and all patents, copyrights, and applications therefore, both in the United States and in any foreign country, in connection with any such inventions, creations, improvements, or developments, and to do, and cause its employees to do, any and all acts, and to execute any and all instruments, which Company may reasonably request to secure for itself, its

successors or assigns, any rights relating to such inventions, creations, improvements, developments, patents, copyrights, or registrations.

6.0 CONFIDENTIALITY

6.1 Except as hereinafter specifically provided, all information disclosed by Company to Contractor pursuant to this Agreement shall be in confidence. Contractor shall not use such information, except as needed to perform his/her obligations under this Agreement, and shall take all reasonable precautions to prevent such information from being disclosed to third parties. All materials containing such information shall be returned to Company upon termination of this Agreement.

6.2 The following information shall not be considered confidential:

(a) Information which was known by Contractor as of the date of this Agreement;

(b) Information which is publicly known as of the date of this Agreement;

(c) Information which hereafter becomes publicly known, unless as a result of the fault of Contractor; and

(d) Information which Company agrees in writing is not confidential.

6.3 In addition, all information and data developed by Contractor as a result of performing Services under this Agreement shall be transmitted by Contractor to Company, shall become the property of Company and shall likewise be regarded by Contractor as confidential, subject to the same exceptions as set forth above with respect to information disclosed to Contractor by Company, provided however, that Contractor shall only be required to treat such information and such data as confidential for a period of one year after the termination of this Agreement.

6.4 At the conclusion of Contractor's work under this Agreement, if Contractor has used a computer to perform its work under this Agreement, Contractor agrees to submit such computer to Company to ensure that all confidential information of Company is erased.



<PAGE>

7.0 TERMINATION

This Agreement will terminate upon the completion of the Services, by the date in Section 2.0 Term or as set forth below. In such case, Company's obligation to Contractor for performance of the Services shall be limited to payment to Contractor of amounts due for work completed but not yet paid. Contractor's obligation shall be limited to providing Company with all data/services prepared to date and preparation of a final invoice. The obligations of Contractor under Paragraphs 4.0, 5.0, 6.0, 8.0, 11.0, and 12.0 shall survive any termination of this Agreement.

7.1 Automatic termination upon the occurrence of any of the following:

(a) Conversion to full time employment by Contráctor

(b) Bankruptcy or insolvency of either party;

(c) Sale of the business by either party;

(d) Death of either party.

7.2 Termination for Default: If either party defaults in the performance of this Agreement or materially breach any of the provisions, the non-breaching party may terminate this Agreement by giving ten days written notice of such breach. Termination shall be effective five days from mailing such notice.

8.0 IMPAIRING OBLIGATIONS

Contractor agrees to devote such time as is necessary to the

performance of the Services, as authorized by Company. Contractor may also perform Services or be employed by other clients provided such obligations would not in any way prevent, limit or otherwise impair the providing of the Services to Company.

9.0 RELATIONSHIP OF PARTIES

The relationship of Contractor to Company shall at all times be one of independent Contractor, and neither party shall be nor represent itself to be an employee, agent, representative, partner or joint venturer of the other, nor shall either party have the right or authority to assume or create any obligation on behalf of or in the name of the other or to otherwise act on behalf of the other. Contractor shall not be entitled to any benefits accorded to Company's employees, including but not limited to, workers compensation, disability insurance, vacation, health benefits, 401K participation, or tuition reimbursement. Contractor shall be responsible for providing, at his/her sole expense, and in his/her name, State disability insurance, workers compensation or any other required insurance as well as all licenses and permits usual and/or necessary for conducting the Services.



<PAGE>

10. ASSIGNMENT

All covenants, stipulations, promises and other terms in this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors in interest, assignees and legal representatives. Although Contractor may use its employees to perform this Agreement, the parties agree that Contractor shall not assign this Agreement without the express written consent of Company.

11. PERSONNEL ON PREMISES OF OTHER PARTY; INDEMNIFICATION

All representatives of either party, while on the premises of, or designated by, the other party, shall comply with all reasonable rules and regulations established at such premises. Contractor hereby agrees to indemnify and hold harmless Company, and its officers, directors, agents and employees, from and against any and all liabilities, losses, damages, costs and expenses (including attorneys fees) on account of any claim, suit or action made or brought against Company, or its officers, directors, agents or employees, arising from any act of negligence or willful misconduct of Contractor, or related to any breach or failure of Contractor in connection with the Services.

12. INFRINGEMENT

Contractor warrants that, in rendering the Services hereunder, it shall not knowingly infringe any patent, copyright, trademark, trade secret, or other intellectual property right of any third party, and it shall use best efforts to avoid any such infringement. Contractor hereby agrees to defend Company against any claim of patent, copyright, trademark, trade secret, or other intellectual property infringement made against Company on account of the services rendered by Contractor. Contractor further agrees to indemnify and hold Company harmless against any loss, damage, award or expense (including reasonable attorneys fees) resulting from such a claim.

13.0 WAIVERS

A waiver of any breach or default hereunder by any party shall not constitute the waiver of a subsequent breach or default of the same or a different provision of this Agreement.

14.0 INVALIDITY

If any provision of this Agreement, shall be held to be invalid, illegal or unenforceable, that provision shall be deemed modified to the extent necessary to make it valid and operative, or if it cannot be so modified then it shall be severed, and the validity, legality or enforceability of the remaining provisions shall not be affected or impaired thereby.



<PAGE>

15.0 ARBITRATION

Should any dispute occur between the parties arising out of or related to this Agreement, that dispute shall be settled and determined by arbitration under the then current rules of the American Arbitration Association. The decision and award of the Arbitrator shall be final and binding and the award so rendered may be entered in any court having jurisdiction thereof. The arbitration shall be held and the award shall be deemed to be made in Providence, Rhode Island. Further, all questions of law shall be decided in accordance with the laws of the State of Rhode Island, without reference to the conflicts of laws provisions thereof.

16.0 COMPLETE UNDERSTANDING

Each party acknowledges that it has read this Agreement and agrees that it is the complete and exclusive understanding between the parties.

| | |
|---|---|
| "Contractor"<br>Kevin Quaintance | " Company"<br>ICOA, Inc.<br>a Nevada corporation |
| By ____________________ | By ____________________<br>Erwin Vahlsing, Jr.<br>CFO |
| September 8, 2004 | September 8, 2004 |



<PAGE>

APPENDIX A

SERVICES TO BE PROVIDED

Management of Call Center, Operations and the acquired entity of AuthDirect, Inc.

PAYMENTS TO CONTRACTOR

$ 8,333.33 per month



</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-16.4
<SEQUENCE>5
<FILENAME>ex164.txt
<DESCRIPTION>CONSULTING AGREEMENT
<TEXT>

INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement ("Agreement") is between ICOA, INC.

("Company"), with its principal place of business at 111 Airport Rd. Warwick, RI 02889 and Joel Stalder ("Contractor").

In consideration of the agreements set forth below, the parties agree as follows:

1.0 SCOPE OF SERVICES

Contractor shall furnish services to the Company as described in Exhibit A, attached hereto and incorporated herein by this reference (the "Services"). Contractor shall determine the method, details and means of performing the Services.

2.0 TERM

The Effective Date of the Agreement shall be September 8, 2004.

The term of this Agreement ("Term") shall commence on the Effective Date and shall continue through December 1, 2004 unless terminated by either party pursuant to paragraph 7 or extended by written mutual agreement of the parties.

3.0 CONSIDERATION

Company shall pay to Contractor, as consideration for Contractor's complete performance of the Services the amount or rate specified in Exhibit A. Contractor shall bill Company monthly, with payment to be made within thirty days of receipt of the invoice from Contractor. Contractor shall be responsible for all expenses incurred in association with the performance of the Services.

4.0 TAXES

Contractor shall have sole responsibility for payment of any and all taxes incurred as a result of Contractor's compensation hereunder, including but not limited to, estimated, foreign, federal, state, and local taxes or contributions imposed or required under unemployment insurance, social security and income tax laws and for filing all required tax forms with respect to any amounts paid by Company to Contractor hereunder. Contractor further agrees to provide Company with proof of such payments upon demand. Contractor shall indemnify and hold Company harmless against any claim of liability, including penalties, damages or injuries suffered by Company resulting from failure of Contractor to pay such taxes or contributions, or failure of Contractor to file any such tax forms.



<PAGE>

5.0 INVENTIONS, CREATIONS, IMPROVEMENTS OR OTHER DEVELOPMENTS

Contractor shall disclose and does hereby assign to Company, its successors and assigns, any and all inventions, creations, improvements, or other developments, each whether patentable, copyrightable or not, which Contractor may hereafter make or assist in making and which result from the Services performed under this Agreement. Contractor hereby assigns to Company, its successors or assigns, any and all patents, copyrights, and applications therefore, both in the United States and in any foreign country, in connection with any such inventions, creations, improvements, or developments, and to do, and cause its employees to do, any and all acts, and to execute any and all instruments, which Company may reasonably request to secure for itself, its successors or assigns, any rights relating to such inventions, creations, improvements, developments, patents, copyrights, or registrations.

6.0 CONFIDENTIALITY

6.1 Except as hereinafter specifically provided, all information disclosed by Company to Contractor pursuant to this Agreement shall be in confidence. Contractor shall not use such information, except as needed to perform his/her obligations under this Agreement, and shall take all reasonable precautions to prevent such information from being disclosed to third parties. All materials containing such information shall be returned to Company upon termination of this Agreement.

6.2 The following information shall not be considered confidential:

(a) Information which was known by Contractor as of the date of this Agreement;

(b) Information which is publicly known as of the date of this Agreement;

(c) Information which hereafter becomes publicly known, unless as a result of the fault of Contractor; and

(d) Information which Company agrees in writing is not confidential.

6.3 In addition, all information and data developed by Contractor as a result of performing Services under this Agreement shall be transmitted by Contractor to Company, shall become the property of Company and shall likewise be regarded by Contractor as confidential, subject to the same exceptions as set forth above with respect to information disclosed to Contractor by Company, provided however, that Contractor shall only be required to treat such information and such data as confidential for a period of one year after the termination of this Agreement.

6.4 At the conclusion of Contractor's work under this Agreement, if Contractor has used a computer to perform its work under this Agreement, Contractor agrees to submit such computer to Company to ensure that all confidential information of Company is erased.



<PAGE>

7.0 TERMINATION

This Agreement will terminate upon the completion of the Services, by the date in Section 2.0 Term or as set forth below. In such case, Company's obligation to Contractor for performance of the Services shall be limited to payment to Contractor of amounts due for work completed but not yet paid. Contractor's obligation shall be limited to providing Company with all data/services prepared to date and preparation of a final invoice. The obligations of Contractor under Paragraphs 4.0, 5.0, 6.0, 8.0, 11.0, and 12.0 shall survive any termination of this Agreement.

7.1 Automatic termination upon the occurrence of any of the following:

(a) Conversion to full time employment by Contractor

(b) Bankruptcy or insolvency of either party;

(c) Sale of the business by either party;

(d) Death of either party.

7.2 Termination for Default: If either party defaults in the performance of this Agreement or materially breach any of the provisions, the non-breaching party may terminate this Agreement by giving ten days written notice of such breach. Termination shall be effective five days from mailing such notice.

8.0 IMPAIRING OBLIGATIONS

Contractor agrees to devote such time as is necessary to the performance of the Services, as authorized by Company. Contractor may also perform Services or be employed by other clients provided such obligations would not in any way prevent, limit or otherwise impair the providing of the Services to Company.

9.0 RELATIONSHIP OF PARTIES

The relationship of Contractor to Company shall at all times be one of independent Contractor, and neither party shall be nor represent itself to be an employee, agent, representative, partner or joint venturer of the other, nor shall either party have the right or authority to assume or create any obligation on behalf of or in the name of the other or to otherwise act on behalf of the other. Contractor shall not be entitled to any benefits accorded to Company's employees, including but not limited to, workers compensation, disability insurance, vacation, health benefits, 401K participation, or tuition reimbursement. Contractor shall be responsible for providing, at his/her sole expense, and in his/her name, State disability insurance, workers compensation

or any other required insurance as well as all licenses and permits usual and/or necessary for conducting the Services.



<PAGE>

10. ASSIGNMENT

All covenants, stipulations, promises and other terms in this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors in interest, assignees and legal representatives. Although Contractor may use its employees to perform this Agreement, the parties agree that Contractor shall not assign this Agreement without the express written consent of Company.

11. PERSONNEL ON PREMISES OF OTHER PARTY; INDEMNIFICATION

All representatives of either party, while on the premises of, or designated by, the other party, shall comply with all reasonable rules and regulations established at such premises. Contractor hereby agrees to indemnify and hold harmless Company, and its officers, directors, agents and employees, from and against any and all liabilities, losses, damages, costs and expenses (including attorneys fees) on account of any claim, suit or action made or brought against Company, or its officers, directors, agents or employees, arising from any act of negligence or willful misconduct of Contractor, or related to any breach or failure of Contractor in connection with the Services.

12. INFRINGEMENT

Contractor warrants that, in rendering the Services hereunder, it shall not knowingly infringe any patent, copyright, trademark, trade secret, or other intellectual property right of any third party, and it shall use best efforts to avoid any such infringement. Contractor hereby agrees to defend Company against any claim of patent, copyright, trademark, trade secret, or other intellectual property infringement made against Company on account of the services rendered by Contractor. Contractor further agrees to indemnify and hold Company harmless against any loss, damage, award or expense (including reasonable attorneys fees) resulting from such a claim.

13.0 WAIVERS

A waiver of any breach or default hereunder by any party shall not constitute the waiver of a subsequent breach or default of the same or a different provision of this Agreement.

14.0 INVALIDITY

If any provision of this Agreement, shall be held to be invalid, illegal or unenforceable, that provision shall be deemed modified to the extent necessary to make it valid and operative, or if it cannot be so modified then it shall be severed, and the validity, legality or enforceability of the remaining provisions shall not be affected or impaired thereby.



<PAGE>

15.0 ARBITRATION

Should any dispute occur between the parties arising out of or related to this Agreement, that dispute shall be settled and determined by arbitration under the then current rules of the American Arbitration Association. The decision and award of the Arbitrator shall be final and binding and the award so rendered may be entered in any court having jurisdiction thereof. The arbitration shall be held and the award shall be deemed to be made in Providence, Rhode Island. Further, all questions of law shall be decided in accordance with the laws of the State of Rhode Island, without reference to the conflicts of laws provisions thereof.

16.0 COMPLETE UNDERSTANDING

Each party acknowledges that it has read this Agreement and agrees that it is the complete and exclusive understanding between the parties.

| | |
|---|---|
| "Contractor" | " Company" |
| Joel Stalder | ICOA, Inc. |

a Nevada corporation

By ______________________ By ______________________
Erwin Vahlsing, Jr.
CFO

September 8, 2004 September 8, 2004



<PAGE>

APPENDIX A

SERVICES TO BE PROVIDED

Management of AuthDirect office in San Jose, CA and development of software and services for customers

PAYMENTS TO CONTRACTOR

$ 6,666.67 per month



</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-16.5
<SEQUENCE>6
<FILENAME>ex165.txt
<DESCRIPTION>FORM OF WARRANT
<TEXT>

THIS WARRANT AND THE COMMON SHARES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR UNDER APPLICABLE STATE SECURITIES LAWS. THIS WARRANT AND THE COMMON SHARES ISSUABLE UPON EXERCISE OF THIS WARRANT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THIS WARRANT UNDER SAID ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO ICOA, INC. THAT SUCH REGISTRATION IS NOT REQUIRED.

Right to Purchase XXXXXXX Shares of Common Stock of ICOA, Inc. (subject to adjustment as provided herein)

FORM OF WARRANT

No. 2004-4 Issue Date: September 8, 2004

ICOA, INC., a corporation organized under the laws of the State of

Nevada (the "Company"), hereby certifies that, for value received, ____________ ("Investor") is entitled, subject to the terms set forth below, to purchase from the Company from and after the Issue Date of this Warrant and at any time or from time to time before 5:00 p.m., Rhode Island time, on the third anniversary of the date hereof (the "Expiration Date"), up to XXXXXXX fully paid and nonassessable shares of Common Stock (as hereinafter defined), $.0001 par value per share, of the Company, at a purchase price of $.05 per share (such purchase price per share as adjusted from time to time as herein provided is referred to herein as the "Purchase Price"). The number and character of such shares of Common Stock and the Purchase Price are subject to adjustment as provided herein.

As used herein the following terms, unless the context otherwise requires, have the following respective meanings:

(a) The term "Company" shall include ICOA, Inc. and any corporation which shall succeed or assume the obligations of ICOA, Inc. hereunder.

(b) The term "Common Stock" includes (a) the Company's Common Stock, $.0001 par value per share, as authorized on the date of the Subscription Agreement referred to in Section 9 hereof, (b) any other capital stock of any class or classes (however designated) of the Company, authorized on or after such date, the holders of which shall have the right, without limitation as to amount, either to all or to a share of the balance of current dividends and liquidating dividends after the payment of dividends and distributions on any shares entitled to preference, and the holders of which shall ordinarily, in the absence of contingencies, be entitled to vote for the election of a majority of directors of the Company (even if the right so to vote has been suspended by the happening of such a contingency) and (c) any other securities into which or for which any of the securities described in (a) or (b) may be converted or exchanged pursuant to a plan of recapitalization, reorganization, merger, sale of assets or otherwise.

1

<PAGE>

(c) The term "Other Securities" refers to any stock (other than Common Stock) and other securities of the Company or any other person (corporate or otherwise) which the holder of the Warrant at any time shall be entitled to receive, or shall have received, on the exercise of the Warrant, in lieu of or in addition to Common Stock, or which at any time shall be issuable or shall have been issued in exchange for or in replacement of Common Stock or Other Securities pursuant to Section 4 or otherwise.

1. Exercise of Warrant.

1.1. Number of Shares Issuable upon Exercise. From and after the date hereof through and including the Expiration Date, the holder hereof shall be entitled to receive, upon exercise of this Warrant in whole in accordance with the terms of subsection 1.2 or upon exercise of this Warrant in part in accordance with subsection 1.3, shares of Common Stock of the Company, subject to adjustment pursuant to Section 4.

1.2. Full Exercise. This Warrant may be exercised in full by the holder hereof by delivery of an original or fax copy of the form of subscription attached as Exhibit A hereto (the "Subscription Form") duly executed by such holder and surrender of the original Warrant within seven days of exercise, to the Company at its principal office or at the office of its Warrant agent (as provided hereinafter), accompanied at the time of exercise by payment, in cash, wire transfer, or by certified or official bank check payable to the order of the Company, in the amount obtained by multiplying the number of shares of Common Stock for which this Warrant is then exercisable by the Purchase Price (as hereinafter defined) then in effect.

1.3. Partial Exercise. This Warrant may be exercised in part (but not for a fractional share) by surrender of this Warrant in the manner and at the place provided in subsection 1.2 except that the amount payable by the holder on such partial exercise shall be the amount obtained by multiplying (a) the number of shares of Common Stock designated by the holder in the Subscription Form by (b) the Purchase Price then in effect. On any such partial exercise, the Company, at its expense, will forthwith issue and deliver to or upon the order of the holder hereof a new Warrant of like tenor, in the name of the holder hereof or as such holder (upon payment by such holder of any applicable transfer taxes) may request, the number of shares of Common Stock for which such Warrant may still be exercised.

1.4. Company Acknowledgment. The Company will, at the time of the exercise of the Warrant, upon the request of the holder hereof acknowledge in writing its continuing obligation to afford to such holder any rights to which such holder shall continue to be entitled after such exercise in accordance with the provisions of this Warrant. If the holder shall fail to make any such request, such failure shall not affect the continuing obligation of the Company to afford to such holder any such rights.

1.6. Trustee for Warrant Holders. In the event that a bank or trust company shall have been appointed as trustee for the holders of the Warrants pursuant to Subsection 3.2, such bank or trust company shall have all the powers and duties of a warrant agent (as hereinafter described) and shall accept, in its own name for the account of the Company or such successor person as may be entitled thereto, all amounts otherwise payable to the Company or such successor, as the case may be, on exercise of this Warrant pursuant to this Section 1.



<PAGE>

2. Delivery of Stock Certificates, etc. on Exercise. The Company agrees that the shares of Common Stock purchased upon exercise of this Warrant shall be deemed to be issued to the holder hereof as the record owner of such shares as of the close of business on the date on which this Warrant shall have been surrendered and payment made for such shares as aforesaid. As soon as practicable after the exercise of this Warrant in full or in part, and in any event within 7 days thereafter, the Company at its expense (including the payment by it of any applicable issue taxes) will cause to be issued in the name of and delivered to the holder hereof, or as such holder (upon payment by such holder of any applicable transfer taxes) may direct in compliance with applicable Securities Laws, a certificate or certificates for the number of duly and validly issued, fully paid and nonassessable shares of Common Stock (or Other Securities) to which such holder shall be entitled on such exercise, plus, in lieu of any fractional share to which such holder would otherwise be entitled, cash equal to such fraction multiplied by the then Fair Market Value of one full share, together with any other stock or other securities and property (including cash, where applicable) to which such holder is entitled upon such exercise pursuant to Section 1 or otherwise.

3. Adjustment for Reorganization, Consolidation, Merger, etc.

3.1. Reorganization, Consolidation, Merger, etc. In case at any time or from time to time, the Company shall (a) effect a reorganization, (b) consolidate with or merge into any other person, or (c) transfer all or substantially all of its properties or assets to any other person under any plan or arrangement contemplating the dissolution of the Company, then, in each such case, as a condition to the consummation of such a transaction, proper and adequate provision shall be made by the Company whereby the holder of this Warrant, on the exercise hereof as provided in Section 1 at any time after the consummation of such reorganization, consolidation or merger or the effective date of such dissolution, as the case may be, shall receive, in lieu of the Common Stock (or Other Securities) issuable on such exercise prior to such consummation or such effective date, the stock and other securities and property (including cash) to which such holder would have been entitled upon such consummation or in connection with such dissolution, as the case may be, if such holder had so exercised this Warrant, immediately prior thereto, all subject to further adjustment thereafter as provided in Section 4.

3.2. Dissolution. In the event of any dissolution of the Company following the transfer of all or substantially all of its properties or assets, the Company, prior to such dissolution, shall at its expense deliver or cause to be delivered the stock and other securities and property (including cash, where applicable) receivable by the holders of the Warrants after the effective date of such dissolution pursuant to this Section 3 to a bank or trust company having its principal office in New York, NY, as trustee for the holder or holders of the Warrants only to the extent that the value of such cash and property exceeds the Purchase Price.



<PAGE>

3.3. Continuation of Terms. Upon any reorganization, consolidation, merger or transfer (and any dissolution following any transfer) referred to in this Section 3, this Warrant shall continue in full force and effect and the terms hereof shall be applicable to the shares of stock and other

securities and property receivable on the exercise of this Warrant after the consummation of such reorganization, consolidation or merger or the effective date of dissolution following any such transfer, as the case may be, and shall be binding upon the issuer of any such stock or other securities, including, in the case of any such transfer, the person acquiring all or substantially all of the properties or assets of the Company, whether or not such person shall have expressly assumed the terms of this Warrant as provided in Section 4. In the event this Warrant does not continue in full force and effect after the consummation of the transaction described in this Section 3, then only in such event will the Company's securities and property (including cash, where applicable) receivable by the holders of the Warrants be delivered to the Trustee as contemplated by Section 3.2.

3.4. Share Issuance. Except for the Excepted Issuances as described in Section 11 of the Subscription Agreement, if the Company at any time shall issue any shares of Common Stock prior to the complete exercise of this Warrant for a consideration less than the Purchase Price that would be in effect at the time of such issue, then, and thereafter successively upon each such issue, the Purchase Price shall be reduced as follows: (i) the number of shares of Common Stock outstanding immediately prior to such issue (calculated on a fully-diluted basis, as if all convertible securities were converted and all outstanding warrants and options were exercised) shall be multiplied by the Purchase Price in effect at the time of such issue and the product shall be added to the aggregate consideration, if any, received by the Company upon such issue of additional shares of Common Stock; and (ii) the sum so obtained shall be divided by the number of shares of Common Stock outstanding immediately after such issue. The resulting quotient shall be the adjusted Purchase Price. For purposes of this adjustment, the issuance of any security of the Company carrying the right to convert such security into shares of Common Stock or of any warrant, right or option to purchase Common Stock shall result in an adjustment to the Purchase Price upon the issuance of shares of Common Stock upon exercise of such conversion or purchase rights.

4. Extraordinary Events Regarding Common Stock. In the event that the Company shall (a) issue additional shares of the Common Stock as a dividend or other distribution on outstanding Common Stock, (b) subdivide its outstanding shares of Common Stock, or (c) combine its outstanding shares of the Common Stock into a smaller number of shares of the Common Stock, then, in each such event, the Purchase Price shall, simultaneously with the happening of such event, be adjusted by multiplying the then Purchase Price by a fraction, the numerator of which shall be the number of shares of Common Stock outstanding immediately prior to such event and the denominator of which shall be the number of shares of Common Stock outstanding immediately after such event, and the product so obtained shall thereafter be the Purchase Price then in effect. The Purchase Price, as so adjusted, shall be readjusted in the same manner upon the happening of any successive event or events described herein in this Section 4. The number of shares of Common Stock that the holder of this Warrant shall thereafter, on the exercise hereof as provided in Section 1, be entitled to receive shall be increased to a number determined by multiplying the number of shares of Common Stock that would otherwise (but for the provisions of this Section 4) be issuable on such exercise by a fraction of which (a) the numerator is the Purchase Price that would otherwise (but for the provisions of this Section 4) be in effect, and (b) the denominator is the Purchase Price in effect on the date of such exercise.



<PAGE>

5. Certificate as to Adjustments. In each case of any adjustment or readjustment in the shares of Common Stock (or Other Securities) issuable on the exercise of the Warrants, the Company at its expense will promptly cause its Chief Financial Officer or other appropriate designee to compute such adjustment or readjustment in accordance with the terms of the Warrant and prepare a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based, including a statement of (a) the consideration received or receivable by the Company for any additional shares of Common Stock (or Other Securities) issued or sold or deemed to have been issued or sold, (b) the number of shares of Common Stock (or Other Securities) outstanding or deemed to be outstanding, and (c) the Purchase Price and the number of shares of Common Stock to be received upon exercise of this Warrant, in effect immediately prior to such adjustment or readjustment and as adjusted or readjusted as provided in this Warrant. The Company will forthwith mail a copy of each such certificate to the holder of the Warrant and any Warrant agent of the Company (appointed pursuant to Section 11 hereof).

6. Reservation of Stock, etc. Issuable on Exercise of Warrant;

Financial Statements. The Company will at all times reserve and keep available, solely for issuance and delivery on the exercise of the Warrants, all shares of Common Stock (or Other Securities) from time to time issuable on the exercise of the Warrant. This Warrant entitles the holder hereof to receive copies of all financial and other information distributed or required to be distributed to the holders of the Company's Common Stock.

7. Assignment; Exchange of Warrant. Subject to compliance with applicable Securities laws, this Warrant, and the rights evidenced hereby, may not be transferred by any registered holder hereof except upon the prior written consent of the Company, which may be granted or withheld in the sole discretion of the company, and if granted, subject to compliance with applicable Securities laws.

8. Replacement of Warrant. On receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and, in the case of any such loss, theft or destruction of this Warrant, on delivery of an indemnity agreement or security reasonably satisfactory in form and amount to the Company or, in the case of any such mutilation, on surrender and cancellation of this Warrant, the Company at its expense will execute and deliver, in lieu thereof, a new Warrant of like tenor.

9. Stock Purchase Agreement. This Warrant is issued pursuant to the Capital Stock Purchase Agreement into by the Company and Investor at or prior to the issue date of this Warrant. The terms of the Capital Stock Purchase Agreement are incorporated herein by this reference.

10. Warrant Agent. The Company may, by written notice to the each holder of the Warrant, appoint an agent for the purpose of issuing Common Stock (or Other Securities) on the exercise of this Warrant pursuant to Section 1, exchanging this Warrant pursuant to Section 7, and replacing this Warrant pursuant to Section 8, or any of the foregoing, and thereafter any such issuance, exchange or replacement, as the case may be, shall be made at such office by such agent.

5

<PAGE>

11. Transfer on the Company's Books. Until this Warrant is transferred on the books of the Company, the Company may treat the registered holder hereof as the absolute owner hereof for all purposes, notwithstanding any notice to the contrary.

12. Notices, etc. All notices and other communications from the Company to the holder of this Warrant shall be mailed by first class registered or certified mail, postage prepaid, at such address as may have been furnished to the Company in writing by such holder or, until any such holder furnishes to the Company an address, then to, and at the address of, the last holder of this Warrant who has so furnished an address to the Company.

13. Miscellaneous. This Warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought. This Warrant shall be construed and enforced in accordance with and governed by the laws of Rhode Island without regard to principles of conflicts or choice of law that would defer to the substantive laws of another jurisdiction. Any dispute relating to this Warrant shall be adjudicated in Rhode Island. The headings in this Warrant are for purposes of reference only, and shall not limit or otherwise affect any of the terms hereof. The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

IN WITNESS WHEREOF, the Company has executed this Warrant under seal as of the date first written above.

ICOA, INC.

By:______________________________
Erwin Vahlsing, Jr.
Chief Financial Officer & Treasurer

Witness:

-------------------------------



<PAGE>

FORM OF SUBSCRIPTION
(To be signed only on exercise of Warrant)

TO: ICOA, Inc.

The undersigned, the holder of the within Warrant, hereby irrevocably elects to exercise this Warrant for, and to purchase thereunder, shares of Common Stock (the "Shares") of ICOA, Inc., a Nevada corporation (the "Company") and herewith makes payment of $ ____________ therefore, and requests that the certificates for such Shares be issued in the name of and delivered to _______ whose address is ___________.

The undersigned hereby represents and warrants to and agrees with the Company that:

The undersigned has been furnished the Company's Form SB-2 registration statement under file number 333-115273 which was declared effective by the Commission on June 7, 2004 together with all Forms 10-Q or 10-QSB, as applicable, and all Forms 10-K or 10-KSB, as applicable, filed with the Commission after May 31, 2004, and other publicly available filings made with the Commission. In addition, the undersigned has received from the Company such other written information concerning its operations, financial condition and other matters as the undersigned has requested, and considered all factors the undersigned deems material in deciding on the advisability of investing in the Shares.

The undersigned is an "accredited investor", as such term is defined in Regulation D promulgated by the Commission under the Securities Act of 1933, as amended (the "1933 Act"), is experienced in investments and business matters, has made investments of a speculative nature and has purchased securities of United States publicly-owned companies in private placements in the past and, with its representatives, has such knowledge and experience in financial, tax and other business matters as to enable the undersigned to utilize the information made available by the Company to evaluate the merits and risks of and to make an informed investment decision with respect to the proposed purchase of the Shares, which represents a speculative investment. The undersigned has the authority and is duly and legally qualified to purchase and own the Shares. The undersigned is able to bear the risk of such investment for an indefinite period and to afford a complete loss thereof.

The undersigned purchases the Shares for its own account and not with a view to any distribution thereof.

The undersigned understands and agrees that the Shares have not been registered under the 1933 Act, by reason of their issuance in a transaction that does not require registration under the 1933 Act (based in part on the accuracy of the representations and warranties of undersigned contained herein), and that such Shares must be held unless a subsequent disposition is registered under the 1933 Act or is exempt from such registration.



<PAGE>

The Shares shall bear the following legend:

> "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR UNDER APPLICABLE STATE SECURITIES LAWS. THESE SHARES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO ICOA, INC. THAT SUCH REGISTRATION IS NOT REQUIRED."

The offer to sell the Shares was directly communicated to the undersigned. At no time was the undersigned presented with or solicited by any leaflet, newspaper or magazine article, radio or television advertisement, or any other form of general advertising or solicited or invited to attend a

promotional meeting otherwise than in connection and concurrently with such communicated offer.

The undersigned represents and warrants that all offers and sales by the undersigned of the Shares shall be made pursuant to registration of the Common Stock under the 1933 Act or pursuant to an exemption from registration under the 1933 Act.

The undersigned represents that the foregoing representations and warranties are true and correct as of the date hereof. The foregoing representations and warranties shall survive the date hereof.

Dated:____________________

____________________________________
(Signature must conform to name of holder as specified on the face of the Warrant)

____________________________________
(Address)



</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----