# EXHIBIT H

# COVER PAGE

---

This page is intentionally blank. Exhibit begins on next page.

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
Dygl3p2SXtDieqjUiJaqiLnFk1TXYyFp7HRobE263GCxJR5UHmSh6ZDSxcRUHTB3
JJ7QhUvPocSaVYdsUNxYoA==

<SEC-DOCUMENT>0001172665-06-000450.txt : 20061122
<SEC-HEADER>0001172665-06-000450.hdr.sgml : 20061122
<ACCEPTANCE-DATETIME>20061122171841
ACCESSION NUMBER: 0001172665-06-000450
CONFORMED SUBMISSION TYPE: 10QSB
PUBLIC DOCUMENT COUNT: 5
CONFORMED PERIOD OF REPORT: 20060930
FILED AS OF DATE: 20061122
DATE AS OF CHANGE: 20061122

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: ICOA INC
CENTRAL INDEX KEY: 0000745084
STANDARD INDUSTRIAL CLASSIFICATION: TELEPHONE COMMUNICATIONS (NO RADIO TELEPHONE) [4813]
IRS NUMBER: 870403239
STATE OF INCORPORATION: NV
FISCAL YEAR END: 1231

FILING VALUES:
FORM TYPE: 10QSB
SEC ACT: 1934 Act
SEC FILE NUMBER: 000-32513
FILM NUMBER: 061237137

BUSINESS ADDRESS:
STREET 1: 111 AIRPORT RD
CITY: WARWICK
STATE: RI
ZIP: 02889
BUSINESS PHONE: 4017399205

MAIL ADDRESS:
STREET 1: 111 AIRPORT RD
CITY: WARWICK
STATE: RI
ZIP: 02889

FORMER COMPANY:
FORMER CONFORMED NAME: ICOA INC /PA
DATE OF NAME CHANGE: 20001117

FORMER COMPANY:
FORMER CONFORMED NAME: QUINTONIX INC
DATE OF NAME CHANGE: 19870403
</SEC-HEADER>
<DOCUMENT>
<TYPE>10QSB
<SEQUENCE>1
<FILENAME>form10qsb.txt
<DESCRIPTION>QUARTERLY FILING
<TEXT>

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-QSB

__X__ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended September 30, 2006

OR

____ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from ______________ to ______________

Commission file number 0-32513

ICOA, INC.
(Exact name of Registrant as Specified in Its Charter)

| Nevada | 87-0403239 |
|---|---|
| (State or Other Jurisdiction of | (IRS Employer Identification No.) |

Incorporation or Organization)

111 Airport Road, Warwick, Rhode Island 02889

(Address of Principal Executive Offices with Zip Code)

Registrant's Telephone Number, Including Area Code: 401-352-2300

Former Name, Former Address and Former Fiscal Year, if Changed Since Last Report

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes _X_ No ___

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer __ Accelerated filer __ Non-accelerated filer _X_

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes __ No _X_

The number of shares of common stock outstanding as of November 20, 2006 was 564,695,192 The number of shares of preferred stock outstanding as of November 20, 2006 was 5,411,255

Transitional Small Business Disclosure Format: Yes __ No _X_

<PAGE>

PART I - FINANCIAL INFORMATION

Item 1. Unaudited Consolidated Balance Sheet at September 30, 2006 .......... 3

Unaudited Consolidated Statements of Operations for the three months ended September 30, 2006 and 2005 and the nine months ended September 30, 2006 and 2005 .......... 4

Unaudited Consolidated Statements of Cash Flows for the nine months ended September 30, 2006 and nine months ended September 30, 2005 .......... 5

Notes to the Unaudited Consolidated Financial Statements .......... 6

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations .......... 15

Item 3. Controls and Procedures .......... 22

PART II - OTHER INFORMATION

Item 2. Changes in Securities .......... 23

Item 3. Default on Senior Securities .......... 23

Item 6. Exhibits .......... 24

SIGNATURES

<PAGE>

ICOA, INC. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEET
September 30, 2006
Unaudited

ASSETS

| | |
|---|---|
| CURRENT ASSETS: | |
| Cash | $ 30,820 |
| Accounts receivable (net of allowance of $79,655) | 395,721 |
| Inventories | 97,199 |
| Prepaid expenses | 37,055 |
| TOTAL CURRENT ASSETS | 560,795 |
| EQUIPMENT, net | 1,224,815 |
| OTHER ASSETS: | |
| Long term receivables | 49,039 |
| Intangibles, net | 2,506,249 |
| Deferred finance costs | 415,268 |
| Deposits | 71,962 |
| TOTAL OTHER ASSETS | 3,042,518 |
| | $ 4,828,128 |

LIABILITIES AND STOCKHOLDERS' DEFICIT

| | |
|---|---|
| CURRENT LIABILITIES: | |
| Cash overdraft | $ 87,645 |
| Accounts payable and accrued expenses | 3,034,218 |
| Payroll tax liability | 1,300,440 |
| Capital lease obligation | 258,988 |
| Convertible debentures due in one year, net unamortized discount of $1,012,803 | 876,076 |
| Notes payable | 1,012,667 |
| Common stock to be issued | 39,600 |
| Preferred stock to be issued | 300,000 |
| Derivative instrument liability | 346,927 |
| TOTAL CURRENT LIABILITIES | 7,256,561 |
| LONG TERM LIABILITIES: | |
| Capital lease obligation | 531,370 |
| Convertible debentures, net unamortized discount of $1,012,803 | 1,087,196 |
| TOTAL LONG TERM LIABILITIES | 1,618,566 |
| STOCKHOLDERS' DEFICIT: | |
| Preferred stock, $.0001 par value; authorized shares - 50,000,000 shares; 5,411,255 issued and outstanding | 541 |
| Common stock, $.0001 par value; authorized shares - 750,000,000 shares; 509,358,575 shares issued and outstanding | 50,950 |
| Additional paid-in capital | 21,560,447 |
| Accumulated deficit | (25,658,937) |
| TOTAL STOCKHOLDERS' DEFICIT | (4,046,999) |
| | $ 4,828,128 |

See notes to unaudited consolidated financial statements



<PAGE>

ICOA, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS
Unaudited

<TABLE>
<CAPTION>

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |

| | | | | |
|---|---|---|---|---|
| REVENUES: | | | | |
| <S> | <C> | <C> | <C> | <C> |
| Transaction service fees | $ 453,792 | $ 539,210 | $ 1,462,554 | $ 980,033 |
| Equipment sales and installation | 60,501 | 109,745 | 312,720 | 442,490 |
| Managed services | 186,881 | 127,257 | 507,480 | 282,353 |
| | ---------------- | ---------------- | --------------- | -------------- |
| TOTAL REVENUE | 701,174 | 776,212 | 2,282,754 | 1,704,876 |
| | ---------------- | ---------------- | --------------- | -------------- |
| COST OF SERVICES: | | | | |
| Telecommunication costs | 223,952 | 214,058 | 618,446 | 381,436 |
| Equipment and installation | 37,357 | 52,911 | 253,385 | 318,794 |
| Managed services | 196,823 | 211,340 | 590,310 | 468,528 |
| Depreciation and amortization | 348,406 | 191,141 | 1,038,376 | 404,187 |
| | ---------------- | ---------------- | --------------- | -------------- |
| TOTAL COST OF SERVICES | 806,538 | 669,450 | 2,500,517 | 1,572,945 |
| | ---------------- | ---------------- | --------------- | -------------- |
| GROSS MARGIN (LOSS) | (105,363) | 106,762 | (217,763) | 131,931 |
| OPERATING EXPENSES: | | | | |
| Selling, general and administrative | 625,898 | 997,113 | 2,272,287 | 3,329,107 |
| Depreciation | 1,181 | 3,476 | 4,481 | 7,977 |
| | ---------------- | ---------------- | --------------- | -------------- |
| TOTAL OPERATING EXPENSES | 627,079 | 1,000,589 | 2,276,768 | 3,337,084 |
| | ---------------- | ---------------- | --------------- | -------------- |
| OPERATING LOSS | (732,441) | (893,827) | (2,494,531) | (3,205,153) |
| INTEREST EXPENSE | (279,156) | (2,322,020) | (827,461) | (3,623,902) |
| MARK TO MARKET - DERIVATIVE INSTRUMENT LIABILITY | 421,496 | - | 1,641,007 | - |
| AMORTIZATION OF NOTE DISCOUNT | (208,425) | - | (602,260) | - |
| | ---------------- | ---------------- | --------------- | -------------- |
| NET LOSS | $ (798,526) | $ (3,215,847) | $ (2,283,244) | $ (6,829,055) |
| | ================ | ================ | =============== | ============== |
| BASIC AND DILUTED - LOSS PER SHARE | $ (0.00) | $ (0.01) | $ (0.01) | $ (0.03) |
| | ================ | ================ | =============== | ============== |
| WEIGHTED AVERAGE COMMON SHARES OUTSTANDING Basic and Diluted | 489,527,929 | 311,906,878 | 432,122,542 | 245,121,859 |
| | ================ | ================ | =============== | ============== |

</TABLE>

See notes to unaudited consolidated financial statements



<PAGE>

ICOA, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS
Unaudited

<TABLE>
<CAPTION>

| | For the Nine Months Ended September 30, | |
|---|---|---|
| | 2006 | 2005 |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| <S> | <C> | <C> |
| Net loss | $ (2,283,244) | $ (6,829,055) |
| | --------------- | ------------- |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation | 4,481 | 7,977 |
| Depreciation of equipment | 507,351 | 404,187 |
| Amortization of intangibles | 531,024 | 94,811 |
| Amortization of deferred financing cost | 661,970 | 276,404 |
| Stock issued for compensation | 5,000 | 424,096 |
| Stock to be issued for services | 21,000 | 39,600 |
| Beneficial conversion and warrants issued for services | 300,000 | 2,969,412 |
| Change in derivative instrument liability | (1,733,053) | - |
| Changes in assets and liabilities: | | |
| Accounts receivable | (39,990) | (69,676) |
| Inventory | (6,793) | (24,670) |
| Deposits | (9,957) | (73,319) |
| Prepaid expenses | (29,113) | (36,997) |
| Other assets | 14,190 | - |
| Payroll taxes | 530,058 | - |
| Accounts payable and accrued expenses | 584,622 | 1,587,210 |
| | --------------- | ------------- |
| Net cash used in operating activities | (942,455) | (1,230,020) |
| | --------------- | ------------- |

| | | |
|---|---|---|
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Acquisition / disposition of equipment | (43,313) | (1,604,426) |
| Other | - | (31,110) |
| NET CASH USED IN INVESTING ACTIVITIES | (43,313) | (1,635,536) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Proceeds from exercise of warrants | 10,000 | - |
| Payments of capital leases | (141,095) | - |
| Payments of notes payable | (102,055) | - |
| Proceeds of private placement | 585,430 | - |
| Payments of convertible debentures | (55,034) | - |
| Proceeds from convertible debentures | 425,000 | 673,009 |
| Proceeds from capital leases | - | 809,712 |
| Increase in deferred finance costs | (27,500) | - |
| Proceeds from notes payable | 285,241 | 1,401,132 |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | 979,987 | 2,883,853 |
| INCREASE (DECREASE) IN CASH | (5,781) | 18,297 |
| CASH - BEGINNING OF PERIOD | 36,601 | 23,676 |
| CASH - END OF PERIOD | $ 30,820 | $ 41,973 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION: | | |
| Cash paid for interest | $ 164,198 | $ 84,233 |
| NON-CASH INVESTING AND FINANCING ACTIVITIES: | | |
| Conversion of debentures and interest into stock | $ 662,327 | $ 693,179 |
| Conversion of notes and interest into stock | $ 30,000 | $ 2,180,990 |
| Common stock issued in connection with settlements | $ 900,000 | $ 1,036,658 |
| Capital leases | $ - | $ 734,377 |
| ACQUISITION DETAILS: | | |
| Fair value of assets acquired | $ - | $ 3,919,196 |
| Liabilities assumed | $ - | $ 559,401 |
| Common stock issued for acquisition | $ - | $ 3,103,191 |

</TABLE>

See notes to unaudited consolidated financial statements



<PAGE>

ICOA, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
Nine Months Ended September 30, 2006 and 2005
(Unaudited)

Note 1--Basis of Interim Financial Statement Presentation

The accompanying unaudited consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim information. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. The results of operations for the interim periods shown in this report are not necessarily indicative of expected results for any future interim period or for the entire fiscal year. ICOA, Inc. and Subsidiaries (the "Company"), believes that the quarterly information presented includes all adjustments (consisting only of normal, recurring adjustments) necessary for a fair presentation in accordance with generally accepted accounting principles. The accompanying consolidated financial statements should be read in conjunction with the Company's Form 10-KSB as filed with the Securities and Exchange Commission for the year ended December 31, 2005.

Note 2--Going Concern

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern, which presumes that the Company will be able to continue to meet its obligations and realize its assets in the normal course of business.

As shown in the accompanying financial statements, the Company has a history of losses with an accumulated deficit of $25,658,937 and $23,375,805 at September 30, 2006 and December 31, 2005, respectively. The Company also had a working capital deficiency of $6,695,766 and $8,192,239 at September 30, 2006 and December 31, 2005, respectively. These conditions raise substantial doubt about the Company's ability to continue as a going concern. The Company's continuation as a going concern is dependent upon its ability to ultimately attain profitable operations, generate sufficient cash flow to meet its obligations, and obtain additional financing as may be required.

Note 3 - Summary of Significant Accounting Policies

A summary of significant accounting policies is included in Note 3 to the audited consolidated financial statements included in the Company's Annual Report on Form10-KSB for the year ended December 31, 2005. Management believes that the application of these policies on a consistent basis enables the Company to provide useful and reliable financial information about the company's operating results and financial condition. Below is provided a synopsis of the most significant policies.

Principles of Consolidation - The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. All material intercompany transactions and balances have been eliminated in consolidation.

Cash and Cash Equivalents - The Company considers all highly liquid short-term investments, with a remaining maturity of three months or less when purchased, to be cash equivalents.

Use of Estimates - The preparation of financial statements in accordance with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting periods. Significant estimates made by management include, but are not limited to, the realization of receivables. Actual results will differ from these estimates



<PAGE>

Accounts receivable and concentration of credit risk - Concentration of credit risk with respect to trade receivables is limited to customers dispersed across the United States of America. While trade receivables are concentrated in the quick service restaurant segment of the economy, the Company has begun to diversify its sales and has developed additional markets such as marinas, RV Parks, and Hotels for its services; accordingly the Company has reduced its exposure to business and economic risk. Although the Company does not currently foresee a concentrated credit risk associated with these trade receivables, repayment is dependent upon the financial stability of the various customers.

Fair Value of Financial Instruments - The Company considers its financial instruments, which are carried at cost, to approximate fair value due to their near-term maturities.

Deferred Financing Costs - The Company amortizes deferred financing costs over the life of the notes which range from one to three years.

Inventories - Inventories consists of equipment held for resale or staged for future installation. Inventories are valued at the lower of cost or market based on specific identification. Obsolete inventory is written off and disposed of on a periodic basis.

Equipment - Equipment are recorded at cost. Depreciation is provided by the straight - line method over the estimated useful lives of the related assets, which is estimated to be from three to seven years.

Intangibles - Intangibles represent the net value of the customer lists and contracts acquired in the acquisitions of Airport Network Solutions, Inc., AuthDirect, Inc., Wise Technologies, Inc., and Linkspot, Inc. The Company has adopted the provisions of SFAS No 142, "Goodwill and Other Intangible Assets" ("SFAS 142") for the determination of fair value of the intangibles carrying value.

Loss per Common Share - Net loss per common share is based on the weighted average number of shares outstanding. Potential common shares includable in the computation of fully diluted per share results are not presented in the financial statements as their effect would be anti-dilutive.

Revenue Recognition -
Revenue generated for Internet access via Wi-Fi or Internet terminals (transaction service fees) is recognized at the time the service is used. Costs associated with providing the services are expensed as

Revenue generated from the sale and configuration of Wi-Fi equipment is recognized at time of shipment FOB to the customer. Costs associated with the equipment sold are expensed at the time of shipment. Configuration and setup labor is expensed as incurred.

Revenue generated from managed services (both help desk and network management) is recognized at the time of billing. Services are billed at the beginning of each month's activity.

Impact of New Accounting Standards Recent Accounting Pronouncements
In February 2006, the FASB issued FASB Statement No. 155, which is an amendment of FASB Statements No. 133 and 140. This Statement; a) permits fair value re-measurement for any hybrid financial instrument that contains an embedded derivative that otherwise would require bifurcation, b) clarifies which interest-only strip and principal-only strip are not subject to the requirements of Statement 133, c) establishes a requirement to evaluate interests in securitized financial assets to identify interests that are freestanding derivatives or that are hybrid financial instruments that contain an embedded derivative requiring bifurcation, d) clarifies that concentrations of credit risk in the form of subordination are not embedded derivatives, e) amends Statement 140 to eliminate the prohibition on a qualifying special-purpose entity from holding a derivative financial instrument that pertains to a beneficial interest other than another derivative financial instrument. This Statement is effective for financial statements for fiscal years beginning after September 15, 2006. Earlier adoption of this Statement is permitted as of the beginning of an entity's fiscal year, provided the entity has not yet issued any financial statements for that fiscal year. Management believes this Statement will have no impact on the financial statements of the Company once adopted.



<PAGE>

In March 2006, the FASB issued FASB Statement No. 156, which amends FASB Statement No. 140. This Statement establishes, among other things, the accounting for all separately recognized servicing assets and servicing liabilities. This Statement amends Statement 140 to require that all separately recognized servicing assets and servicing liabilities be initially measured at fair value, if practicable. This Statement permits, but does not require, the subsequent measurement of separately recognized servicing assets and servicing liabilities at fair value. An entity that uses derivative instruments to mitigate the risks inherent in servicing assets and servicing liabilities is required to account for those derivative instruments at fair value. Under this Statement, an entity can elect subsequent fair value measurement to account for its separately recognized servicing assets and servicing liabilities. By electing that option, an entity may simplify its accounting because this Statement permits income statement recognition of the potential offsetting changes in fair value of those servicing assets and servicing liabilities and derivative instruments in the same accounting period. This Statement is effective for financial statements for fiscal years beginning after September 15, 2006. Earlier adoption of this Statement is permitted as of the beginning of an entity's fiscal year, provided the entity has not yet issued any financial statements for that fiscal year. Management believes this Statement will have no impact on the financial statements of the Company once adopted.

In June 2006, the Financial Accounting Standards Board (FASB) issued Financial Interpretation (FIN) No. 48, "Accounting for Uncertainty in Income Taxes -- an Interpretation of FASB Statement No. 109." FIN 48 addresses the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with Statement of Financial Accounting Standards (SFAS) No. 109, "Accounting for Income Taxes." FIN 48 prescribes specific criteria for the financial statement recognition and measurement of the tax effects of a position taken or expected to be taken in a tax return. This interpretation also provides guidance on de-recognition of previously recognized tax benefits, classification of tax liabilities on the balance sheet, recording interest and penalties on tax underpayments, accounting in interim periods, and disclosure requirements. FIN 48 is effective for fiscal periods beginning after December 15, 2006. The Company is currently evaluating the impact, if any that the adoption of FIN 48 will have on its financial statements.

In September 2006, the FASB issued FASB Statement No. 157. This Statement defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles (GAAP), and expands disclosures about fair value measurements. This Statement applies under other accounting pronouncements that require or permit fair value measurements, the Board having previously concluded in those accounting pronouncements that fair value is a relevant measurement attribute. Accordingly, this Statement does not require any new fair value measurements. However, for some entities, the application of this Statement will change current practices. This Statement is effective

for financial statements for fiscal years beginning after November 15, 2007. Earlier application is permitted provided that the reporting entity has not yet issued financial statements for that fiscal year. Management is currently evaluating the impact this statement will have on the financial statements of the Company once adopted.

Note 4 -- Convertible Debentures

| Lender | | Amount |
|---|---|---|
| Cornell Capital Partners, 5% interest, due November 2007 | $ | 1,850,000 |
| Accredited individual investors 10% to 12% interest due various dates in 2006 | | 1,126,075 |
| | | 2,976,075 |
| Notes payable discounts | | (1,012,803) |
| Total | $ | 1,963,272 |

In February 2006, the Company issued a two year, secured convertible debenture to Cornell, in the principal amount of $125,000. The debenture carries similar conversion provisions as the November 2, 2005 and December 16, 2005 debentures. In addition, the Company issued 25,000,000 warrants to purchase common shares at a price of $0.01 per share, and 25,000,000 warrants to purchase common shares at a price of $0.03 per share. The warrants have a term of 3 years.



<PAGE>

In January 2006, the Company issued 3,572,851 shares of common stock upon conversion of $104,327.24 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0292 per share.

In February 2006, the Company issued 1,760,563 shares of common stock upon conversion of $50,000 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0284 per share.

In March 2006, the Company issued 2,183,000 shares of common stock upon conversion of $55,448.20 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0254 per share.

In June 2006, the Company issued 7,180,222 shares of common stock upon conversion of $77,552 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0108 per share.

In June 2006, the Company issued 14,925,374 shares of common stock upon conversion of $100,000 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0067 per share.
In July 2006, the Company issued 7,692,308 shares of common stock upon conversion of $50,000 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0065 per share.

In August 2006, the Company issued 16,101,695 shares of common stock upon conversion of $95,000 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0059 per share.

In August 2006, the Company issued 16,000,000 shares of common stock upon conversion of $80,000 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0050 per share.

In September 2006, the Company issued 12,195,122 shares of common stock upon conversion of $50,000 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0041 per share.

In August 2006, the Company issued a two year convertible debenture to Michael Vickers, an accredited investor, in the principal amount of $50,000. The debenture is convertible at a fixed price of $0.0058 per share. The debenture carries interest at a rate of 9% per annum. In addition, the Company issued 8,620,689 two year warrants to purchase common shares; one third at a price of $0.02 per share, one third at a price $0.05 per share, and one third at a price of $0.08 per share. The warrants are subject to a call provision by the Company if the market price per share is above $0.05 per share, $0.08 per share, and $0.11 per share respectively for a period of 5 or more days.

In August 2006, the Company issued a two year convertible debenture to Betsill Builders, an accredited investor, in the principal amount of $250,000. The debenture is convertible at a fixed price of $0.0066 per share. The debenture carries interest at a rate of 9% per annum. In addition, the Company issued 40,000,000 two year warrants to purchase common shares; one third at a price of $0.02 per share, one third at a price $0.05 per share, and one third at a price of $0.08 per share. The warrants are subject to a call provision by the Company if the market price per share is above $0.05 per share, $0.08 per share, and $0.11 per share respectively for a period of 5 or more days.

Note 5 --Notes Payable

From January 2006 through March 2006, the Company issued short term bridge notes totaling $60,712 to Seaport Capital. The notes carried interest at a rate of between 10% and 15% per annum. During the same period, the Company repaid $77,712 to Seaport Capital consisting of the bridge notes secured between January and March 2006, and a previous bridge note issued in December 2005.

From April 2006 through June 2006, the Company issued short term bridge notes totaling $27,911 to Seaport Capital. The notes carry interest at a rate of between 10% and 15% per annum.

From July through September 2006, the Company issued short term bridge notes totaling $43,000 to Seaport Capital. The notes carry interest at a rate of between 10% and 15% per annum.



<PAGE>

In April 2006, the Company received $50,000 from the sale of a term note to an accredited investor. The note is due on June 1, 2006 and carries interest at a rate of 12% per annum. In addition, the investor received a two year warrant to purchase 555,555 shares of common stock at an exercise price of $0.045 per share. Pursuant to the penalty provision, the Investor will receive an additional 2,222,220 common stock warrants since the Company failed to pay the principal and accrued interest on the stated maturity date.

| Lender | | Amount |
|---|---|---|
| Acquisitions (WISE Technologies, Inc) 10% interest, due on demand | | $ 50,000 |
| Bill Thomas, 15% to 25% interest, due on demand | | 295,000 |
| Seaport Capital, 12 to 15% interest, due on demand | | 362,280 |
| Accredited individual investors, 9% to 36% interest, due on demand | | 305,387 |
| | Total | $ 1,012,667 |

Note 6 - Stockholder's Deficit

On February 22, 2006, the Company sold 2,659,574 shares of restricted common stock for a total of $50,000. The shares were issued at an average price of $0.0188 per share.

On March 24, 2006, the Company sold 13,333,333 shares of restricted common stock for a total of $80,000. The shares were issued at an average price of $0.006 per share.

On March 9, 2006 the Company executed a letter of understanding with SSJ Enterprises, LLC ("SSJ") and Street Search, LLC ("Street Search" pertaining to the obligations imposed on the Company as a result of the recent litigation against the Company by SSJ and Street Search. The parties agreed to settle the obligation with 30,000,000 shares of the Company's common stock. The agreement was executed on April 12, 2006. Subsequently, in April 2006, the Company issued 30,000,000 shares of restricted common stock in full settlement of the judgment and subsequent settlement of the litigation between the Company, SSJ, and Street Search. The shares were issued at an average price of $0.03 per share. The previously recorded accrual of $900,000 has been reclassified from `stock to be issued' to equity.

On April 18, 2006, the Company issued 1,000,000 shares of restricted common stock on conversion of warrants. The shares were issued at an average price of $0.01 per share.

On April 19, 2006, the Company sold 15,252,976 shares of restricted common stock for a total of $150,000. The shares were issued at an average price of $0.0098 per share.

On June 15, 2006, the Company sold 3,731,343 shares of restricted common stock for a total of $25,000. The shares were issued at an

average price of $0.0067 per share.

On June 26, 2006, the Company sold 5,411,255 shares of Series B Preferred Stock for a total of $250,000. The series B preferred shares are convertible under certain conditions into 10 shares of common stock. If the preferred shares are converted into common shares, it would be at an average price of $0.0046 per share.

Note 7 - Capital Lease

On May 4, 2005, the Company entered into a Master Lease Agreement with Agility Lease Fund I, LLC. Under the terms of the agreement, the Company can lease up to $1.0 million of equipment and project costs related to Wi-Fi network growth and deployments. In connection with the Master Lease Agreement, the Company is required to issue $200,000 of warrants at the market price on the day prior to closing, and an additional 10% warrant based on the market price on the day prior to each lease schedules execution.



<PAGE>

In May and June 2005, the Company utilized $529,234 of the lease line, and recorded $96,408 of prepaid interest. The three lease schedules are due in May and June 2008.

In July and August 2005, the Company utilized $205,143 of the lease line, and recorded $52,621 of prepaid interest. The two lease schedules are due in July and August 2008.

In connection with the lease agreement and the individual lease draws, the Company issued 4,245,133 three year warrants at prices between $0.056 and $0.06 per share. In connection with the July and August lease draws, the Company issued 204,955 three year warrants at a price of $0.051 per share, and 170,535 three year warrants at a price of $0.059 per share.

In April 2006, the Company defaulted on its payments under the Master Lease Agreement. Agility has invoked their right to directly collect the proceeds of the revenue generated by the leased locations. The Company cooperated in this effort and in September 2006 came to agreement with Agility to re-age the delinquent lease payments. Agility continues to maintain control of the proceeds to maintain timely payment of the leases.

Note 8 - Litigation

On October 8, 2004, SSJ and Street Search filed suit in the United States District Court, District of Rhode Island against the Company, George Strouthopoulos and Erwin Vahlsing alleging breach of contract, breach of oral contract and fraud regarding a Services Agreement, dated October 20, 2003 for consulting services under the agreement. In November 2004, the Company filed its response to the allegations.

In March 2006, the case reached trial, and the fraud charges against the Company, George Strouthopoulos, and Erwin Vahlsing, Jr. were dismissed. The count alleging breach of contract was upheld, and the jury entered judgment against the Company in the amount of $900,000. On April 12, 2006, the Company and the plaintiff's entered into a settlement agreement pursuant to which the Company issued 30,000,000 shares of common stock. The value of these shares at the time of judgment was $900,000 which amount the Company had previously accrued on its books. Accordingly, the Company has reclassified this amount from accounts payable to stock to be issued. In April 2006, the Company issued 30 million shares in full satisfaction of the settlement.

On January 25, 2002, a legal proceeding was commenced by the Company, against World Capital, Inc., a leasing company with which the Company had a contract to finance certain equipment purchases. On June 15, 2001, the Company signed a lease agreement with World Capital, Inc. and made payment of $178,641.49 representing the first and last two months lease payments. On July 25, 2001 World Capital, Inc. gave notice to the Company of its intention not to fund the equipment lease. The Company has filed suit in US District Court for the Eastern District of Pennsylvania seeking recovery of the payment, accrued interest, and damages caused by the failure to fund. In December 2002, the Company amended its complaint against World Capital, Inc. to include criminal fraud charges against the principals of World Capital, Inc. Trial took place in late February, 2005

In April 2005, the Company was advised that its case against World Capital, Inc. had been decided in its favor and judgment was entered against World Capital and its principals in the amount of $218,000. The defendants have appealed the ruling, and uncertainties exist regarding collectibility. In light of these uncertainties, the Company has not recognized any value associate with this litigation.

Note 9 - Acquisitions

On May 26, 2005, the Company acquired the outstanding shares, in exchange for $2,000,000 of common stock and the assumption of a $50,000 note, of Wise Technologies, Inc., a privately held corporation that provides Wi-Fi services in various airports, hotels, and universities. It is operated as a wholly-owned subsidiary.

On July 8, 2005, the Company acquired the outstanding shares, in exchange for $962,999 of commons stock, of LinkSpot Networks, Inc., a privately held corporation that provides Wi-Fi services in various RV Parks and recreation facilities. It is operated as a wholly-owned subsidiary.

On July 28, 2005, the Company acquired the operating assets of Cafe.com, in exchange for $30,000 of cash and $140,085 of common stock. The assets consist of equipment and contracts to provide Wi-Fi services in various west coast based coffee shops.

The above acquisitions have been accounted for as purchases and their results of operations are included in the financial statements of the Company from the date of acquisition.

The following Unaudited pro forma consolidated results of operations have been prepared as if the acquisition of Wise, LinkSpot, and Cafe.com had occurred as of the following period:

<TABLE>
<CAPTION>

| 2005 | As reported, Nine Months Ended September 30, 2005 | Pre-Acquisition Operations | Pro Forma, Nine Months Ended September 30, 2005 (1) |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Revenues | $ 1,704,876 | $ 431,186 | $ 2,136,062 |
| Loss before extraordinary items | (6,829,055) | (980,558) | (7,809,613) |
| Net Loss | (6,829,055) | (980,558) | (7,809,613) |
| Loss per common share | $ (0.02) | | $ (0.02) |
| Shares outstanding | 353,879,220 | | 353,879,220 |

(1) Acquisitions included through date of acquisition.
</TABLE>

Note 10 - Warrants

In connection with the convertible debentures issued in February 2006 to Cornell, the Company issued three year warrants in the following amounts:

- o Warrants to purchase up to 25,000,000 shares of common stock at a price of $0.01 per share
- o Warrants to purchase up to 25,000,000 shares of common stock at a price of $0.03 per share

In April 2006, the holder of $1,000,000 warrants exercised the warrant at its exercise price of $0.01 per share.

In connection with the issuance of convertible debentures in July 2006 to Michael Vickers, the Company issued two year warrants in the following amounts:

- o Warrants to purchase up to 2,873,563 shares of common stock at a price of $0.02 per share
- o Warrants to purchase up to 2,873,563 shares of common stock at a price of $0.05 per share
- o Warrants to purchase up to 2,873,563 shares of common stock at a price of $0.08 per share

In connection with the issuance of convertible debentures in August 2006 to Betsill Builders, the Company issued two year warrants in the following amounts:

- o Warrants to purchase up to 13,333,333 shares of common stock at a price of $0.02 per share
- o Warrants to purchase up to 13,333,333 shares of common stock at a price of $0.05 per share
- o Warrants to purchase up to 13,333,334 shares of common stock at a price of $0.08 per share

<PAGE>

Note 11 - Derivative Liabilities

In 2005, the Company determined that the conversion feature of the convertible debentures entered into with Cornell represented an embedded derivative since the debentures are convertible into a variable number of shares upon conversion. Accordingly, the convertible debentures are not considered to be conventional debt under EITF 00-19 and the embedded conversion feature must be bifurcated from the debt host and accounted for as a derivative liability.

The Company believes that the aforementioned embedded derivatives and freestanding warrants meet the criteria of SFAS 133 and EITF 00-19, and should be accounted for as separate derivatives with a corresponding value recorded as liability.

As a result of the Company's meeting the requirements of SFAS 133, all of the Company's previously issued and outstanding instruments, including fixed price convertible debentures, warrants and options as well as those issued in the future, would be classified as derivative liabilities as well.

In February 2006, the Company issued an additional convertible debenture to Cornell in the principal amount of $125,000 and issued warrants to purchase 25,000,000 shares of common stock at a price of $0.01 per share, and an additional 25,000,000 shares of common stock at a price of $0.03 per share. In connection with this transaction the Company recorded $94,154 as a discount on convertible debentures; interest expense of $1,496,932; and a derivative liability of $1,591,086.

The increase in fair value between the date of inception of the various debt and equity instruments and September 30, 2006 amounted to $1,906,625 and has been recorded as a reversal of interest expense.

The aggregate fair value of the derivative liabilities at the date of issuance of the convertible debenture and at September 30, 2006, is as follows:

<TABLE>
<CAPTION>

| <S> | At Inception <C> | At Dec. 31, 2005 <C> | At Sept. 30, 2006 <C> |
|---|---|---|---|
| Discount on convertible debentures | $ 1,421,102 | $ 1,407,110 | $ 1,012,803 |
| Liability associated with prior convertible debentures and warrants | 832,450 | 672,870 | 665,876 |
| Total derivative liability | $ 2,253,552 | $ 2,079,980 | $ 346,927 |

</TABLE>

Note 12 - Stock Options and Warrants

Effective January 1, 2006, the Company began recording compensation expense associated with stock-based awards and other forms of equity compensation in accordance with FASB Statement No. 123-R, Share-Based Payment ("SFAS 123R") as interpreted by SEC Staff Accounting Bulletin No. 107. The Company adopted the modified prospective transition method provided under SFAS 123R, and consequently has not retroactively adjusted results from prior periods. The Company did not recognize any costs associated with stock-based awards in the first quarter of 2006 as none were granted or unvested prior to January 1, 2006. Prior to January 1, 2006, the Company accounted for stock-based awards using the "disclosure only" alternative described in SFAS 123 and FASB Statement No. 148, Accounting for Stock-Based Compensation.

The Company utilizes the Black-Scholes option-pricing model to calculate the fair value of each individual issuance of options. This method and the underlying assumptions are further described in footnote 13 of our report on Form 10KSB dated December 31, 2005.



<PAGE>

Note 13 - Subsequent Events

In October 2006, the Company received $100,000 from the sale of convertible debentures to accredited investors. The convertible debentures mature in two years, carry interest at a rate of 9% per annum, and are convertible at an average price of $0.0040 per share.

In October 2006, the Company received $10,000 from the sale of a short term demand note to an accredited investor.

In November 2006, the Company received $25,000 from the sale of a short term demand note to an accredited investor.



<PAGE>

Item 2. - Management's Discussion and Analysis of Financial Condition and Results of Operations

THE FOLLOWING ANALYSIS OF THE RESULTS OF OPERATIONS AND FINANCIAL CONDITION OF THE COMPANY SHOULD BE READ IN CONJUNCTION WITH THE CONSOLIDATED FINANCIAL STATEMENTS, INCLUDING THE NOTES THERETO OF THE COMPANY, CONTAINED ELSEWHERE IN THE FORM 10-QSB.

Forward-looking statements in this report may prove to be materially inaccurate. In addition to historical information, this report contains forward-looking information that involves risks and uncertainties. The words "may", "will", "expect", "anticipate", "continue", "estimate", "project", "intend" and similar expressions are intended to identify forward-looking statements. Actual results may differ materially from those included within the forward-looking statements as a result of factors, including the risks described above and factors described elsewhere in this report.

Strategy
Our goal is to be a leading and innovative national provider of broadband solutions. During the third quarter of 2006, ICOA sharpened the focus of its operations into three Strategic Business Units (SBU's).

1. ICOA BroadBand Properties
ICOA BroadBand Properties provides pay-per-use Wi-Fi service on ICOA owned and operated networks at 23 airports, 55 marinas and 75 RV parks across the country as well as at such hospitality locations as the Trump Casino Properties in Atlantic City. Under long-term contracts, ICOA BroadBand Properties designs, builds, maintains, operates and provides call center support for these hotspot networks. Users of these networks pay usage fees to ICOA and ICOA on average pays 20% of hotspot revenues back to the venues. ICOA BroadBand Properties has focused its attention on regional airports and on niche markets where it can enjoy superior margins.

2. ICOA Wi-Fi BroadBand Solutions
ICOA Wi-Fi BroadBand Solutions sells "turnkey" Wi-Fi broadband solutions under multi-year contracts (typically 3 to 5 years) to enterprises which primarily offer Wi-Fi as an amenity in order to increase customer traffic. Enterprises currently served include over 1,500 restaurants, super markets, retail chains, and independently owned outlets. Wi-Fi BroadBand Solutions provides equipment, turn-key maintenance, and backend operational and support services for the hot-spot. Backend services include 24 x 7 network monitoring, call center support, billing, credit card processing and inter-network settlements, user provisioning & authentication and regular reports for the venue owner. ICOA earns profits on the sale of the solutions to the venue and is paid monthly over the life of the contracts.

3. ICOA Managed Services
ICOA Managed Services sells backend support to 66 independent Wi-Fi Internet Service Providers (WF-ISP). WF-ISPs include Wi-Fi service providers such as 5G Wireless, large retail chains such as Staples that have established their own Wi-Fi amenity networks and RF engineering companies that design and build Wi-Fi hotspots for retailers, hospitality, restaurants, Metrozones, and other venues. ICOA Managed Services utilizes ICOA's proprietary, award winning TollBooth(TM) operations and support software and ICOA's nationwide network support capabilities to provide such services as:

- 24x7 network monitoring & call center support for the WF-ISP and its customers.
- Billing, credit card services & inter-network settlements where appropriate
- Network maintenance & provisioning
- User provisioning & authentication

- Regulatory/operational reporting to the Wi-ISP
- Customer network administration via self help portal

ICOA Managed Services receives a one-time payment for integration and development engineering and under multi-year contracts is paid a monthly retainer fee and per transaction fees.

As part of our overall strategy to compete in each relevant segment, we use our core competencies in the design, deployment and management of broadband and broadband wireless networks in and to high-traffic public locations in market segments including but not limited to airports, hospitality, RV resorts and campgrounds, marinas, multiple dwelling units ("MDU's"), restaurants and cafes, travel plazas and higher education.

As of September 30, 2006, ICOA owned or operated over 2,000 broadband access installations in high-traffic locations servicing millions of annual patrons across 45 states. Until earlier this year, the Company's revenue had a strong reliance on one time equipment sales and installation projects. The revenue mix has changed with recurring revenue increasing to 86.3% of total revenue for the nine months ended September 30, 2006 as compared to 74.0% for the same period in 2005. This is an important aspect of our long term growth as the margin on recurring revenue is significantly higher than on equipment and installation sales.



<PAGE>

Today, ICOA is a provider of Wi-Fi networks and services. Our footprint for retail services is targeted at high-traffic and high-value locations, with wireless capability supplemented by a growing wired infrastructure and our kiosk expertise. We also provide cost effective networks for the growing "amenity" services segment. We provide high-quality and reliable support systems and services for both our own operations and as a "back-office" for other service providers. We are sensitive to the specific needs of the growing and changing base of users who demand access to broadband on demand anywhere, anytime, with any device.

Our strategy over time is to focus on expanding end-to-end solutions which meet the present and future needs of customers and the rapid proliferation of new broadband wireless access devices such as hand-held consumer devices, communications devices, PDAs and mobile gaming platforms. We believe our industry will be transformed over time from one driven solely by computing platforms to one increasingly driven by a wide array of communications, gaming and hand-held consumer device platforms. This device platform expansion is increasing usage across our networks as it is also generating new end-user demographic segment demand. In addition, as emerging technologies allow, and subject to available capital, ICOA is looking to move beyond the delivery of Wi-Fi access to the delivery of digital value-added services to deliver value to our customers and users.

We anticipate increased revenue and demand to be generated in our near-term horizon from services including VoIP, increased roaming, location-specific applications, targeted advertising platforms, high-bandwidth content delivery and management, and access to proprietary content. With respect to VoIP, a small but steadily growing customer base has been utilizing VoIP technologies and services over our Wi-Fi networks, and we expect this trend to improve as additional services and VoIP-enabled devices are propagated into the marketplace. This trend is in keeping with broader industry trends, such as the recent Skype/Boingo VoIP over Wi-Fi trials, which will include ICOA's assets in the near future. With respect to ancillary revenue from roaming, ICOA's recently achieved national scale provides the Company with attractive locations of strategic roaming value to other wireless service providers. Our networks were designed as neutral-host specifically to prepare for roaming, a strategy which maximizes revenue-potential from the existing asset base.

With respect to location-specific applications, including targeted advertising, recent advancements in both hardware and software technologies provide opportunities for layered services which were previously not possible, including the value-add localization of advertising revenue. Our strategy includes participating in this important transformation of the broadband wireless industry through active partnerships with key industry solution providers on a go-forward basis. The delivery and management of high bandwidth content is another recent promising development. An example is IPTV and other entertainment industry transitions to full digital platforms. Our strategy during the early-stages includes engaging in select trials with proven partners, ensuring network capacity and architectures meet the requirements of emerging content applications, and preparing for demand as customer tastes and habits mature.

While today ICOA is focused on Wi-Fi, our models and approach is technology-agnostic. We work with numerous technologies, as economies of scale, market penetration and device propagation permit or demand. For example, we are looking to early market tests of Wi-Max, which we believe is a promising technology still in its early stages of development. Wi-Max may serve our medium-term requirements as a fixed wireless backhaul replacement in certain locations, which could bring operational cost savings and expanded reach to locations otherwise unreachable through terrestrial solutions. In the long-term, management believes that as the number of Wi-Max capable devices increases to warrant select upgrades, the strategic value of ICOA's footprint offers a platform from which to transition to mobile Wi-Max solutions. With respect to

newly emerging cellular 3G networks, our strategy includes working with device manufacturers and cellular providers for seamless interoperability between the networks.

We have grown through acquisition and look to continue to do so. Our near to medium term strategy is to continue to acquire promising Wi-Fi and broadband services companies as capital resources allow 1) in market segments targeted for growth and anticipated profitability or 2) with unique infrastructure capabilities. We look for leading companies with management strength, and who are strategically placed in market segments which may offer intrinsic value per share. In the future, we may also consider equity investments in related and complementary companies and assets, which further our strategic objectives, support our key business initiatives and enhance shareholder value.

All of our businesses operate in highly innovative environments characterized by continuing and rapid introduction of new technologies, bundled services and products which offer improved performance at lower prices. Nationally, our competitors range in size from large established national companies with multiple technology and service offerings, to smaller companies and new entrants to the marketplace that compete in specialized market segments. The continued and rapid convergence of computing, communications and consumer devices offers us enhanced opportunities, but also increased competition. Competition tends to increase pricing pressure or require us to modify our business models to remain competitive, which may result in lower profits. Wherever we believe it is advantageous, we may take various steps, including introducing new services and other incentives in order to remain competitive and position the Company to potentially increase market share.



<PAGE>

SIGNIFICANT ACCOUNTING POLICIES

A summary of significant accounting policies is included in Note 3 to the audited consolidated financial statements included in the Company's Annual Report on Form10-KSB for the year ended December 31, 2005. Management believes that the application of these policies on a consistent basis enables the Company to provide useful and reliable financial information about the company's operating results and financial condition. See footnote 3 for additional information.

Results of operations

Three months ended September 30, 2006 as compared to the three months ended September 30, 2005, and nine months ended September20, 2006 as compared to the nine months ended September 20, 2005.

Revenue
Our revenue is derived from the ownership and operation of neutral-host broadband wireless Wi-Fi Hot Spots and High Speed Internet terminals in high traffic public locations, and Wi-Fi equipment sales, installation fees, and network management and maintenance services.

For the period ended September 30, 2006, quarterly revenue decreased $75,038 or 9.7% to $701,174 as compared to $776,212 for the quarter ended September 30, 2005.

The Company realized a 33.9% increase in revenue generating $2,282,754 in revenue for the nine months ended September 30, 2006 as compared to $1,704,876 for the nine months ended September 30, 2005.

The revenue growth for the nine months ended September 30, 2006 is primarily due to increasing Transaction Service Fees and an increase in Managed Services Fees year over year while new Equipment Sales decreased as the Company did not pursue several large projects of the type it completed in the first half of 2005. The decrease in revenue of $75,038 for the three months ended September 20, 2006 versus the three months ended September 30, 2005 is mainly attributable to several locations converting to a managed amenity service model from a customer pay per use model. The increased Managed Services revenue is a result of this shift which long term should yield a stronger gross margin as the Company eliminates costs associated with location operation, and concentrates on providing the more profitable Managed Services. A portion of the overall year to date increase is a result of the acquisitions completed in 2005.

Revenue was generated from the following services:
<TABLE>
<CAPTION>

| | For the three months ended | | For the nine months ended | |
|---|---|---|---|---|
| | September 30, 2006 | September 30, 2005 | September 30, 2006 | September 30, 2005 |
| <S> | <C> | <C> | <C> | <C> |
| Transaction Service Fees | $ 453,792 | $ 539,210 | $ 1,462,554 | $ 980,033 |
| Wi-Fi Equipment Sales and Service | 60,501 | 109,745 | 312,720 | 442,490 |
| Managed Services | 186,881 | 127,257 | 507,480 | 282,353 |

| | | | | |
|---|---|---|---|---|
| Total | $ 701,174 | $ 776,212 | $ 2,282,754 | $ 1,704,876 |

</TABLE>



<PAGE>

Cost of Services consists primarily of:
<TABLE>
<CAPTION>

| | For the three months ended | | For the nine months ended | |
|---|---|---|---|---|
| | September 30, 2006 | September 30, 2005 | September 30, 2006 | September 30, 2005 |
| <S> | <C> | <C> | <C> | <C> |
| Telecom/Co-Location/Hosting Costs | $ 223,952 | $ 214,058 | $ 618,446 | $ 381,436 |
| Wi-Fi Equipment and Installation | 37,357 | 52,911 | 253,385 | 318,794 |
| Managed Services | 196,823 | 211,340 | 590,310 | 468,528 |
| Depreciation Expense | 348,406 | 191,141 | 1,038,376 | 404,187 |
| Total | $ 806,538 | $ 669,450 | $ 2,500,517 | $ 1,572,945 |

</TABLE>

For the quarter ended September 30, 2006, the Company recorded a negative gross margin of ($105,363), as compared to a gross margin of $106,762 for the quarter ended September 30, 2005, an increase of $212,125 or 200%. This was primarily due to the increase in depreciation and amortization of $157,265 coupled with added telecommunication costs.

For the nine months ended September 30, 2006, the negative gross margin was ($217,763), as compared to a gross margin of $131,931 for September 30, 2005, an increase of 265%. This was primarily due to the increase in depreciation and amortization of $634,189.

Cost of Services increased 20% or $137,088 to $806,538 for the three months ended September 30, 2006 versus $669,450 for the three months ended September 30, 2005.

Similarly, the Cost of Services increased 59% or $927,572 to $2,500,517 for the nine months ended September 30, 2006 versus $1,572,945 for the nine months ended September 30, 2005.

The increases both quarterly and year to date, were primarily due to increased costs of providing help desk services as business has increased, additional cost of telecommunications, and an increase in depreciation expense. Depreciation and Amortization Expense increased 82% or $157,265 for the three months ended September 30, 2006 compared to the three months ended September 30, 2005, and 157% or $634,189 for the nine months ended September 30, 2006 compared to the nine months ended September 30, 2005. The increase was primarily due to the amortization of intangible assets associated with the acquisitions of Wise Technologies, LinkSpot Networks, Cafe.com, and depreciation associated with the capital leases.

Selling, general and administrative expenses

General and administrative expenses consist primarily of:
Employee compensation and related expenses including payroll taxes and benefits for executive, administrative and operations personnel, Professional fees associated with deployment of Wi-Fi networks, legal and accounting fees connected with registrations filed with the SEC, professional fees associated with the development and creation of marketing materials in pursuit of advertising contracts, travel and entertainment, and facility and office-related costs such as rent, insurance, maintenance and telephone.

For the quarter ended September 30, 2006 these costs decreased $371,215 or 37% from $997,113 for the quarter ended September 30, 2005 to $625,898.

For the nine months ended September 30, 2006, these expenses decreased $1,056,820 or 32% to $2,272,287 from $3,329,107 for the nine months ended September 30, 2005.

The quarterly decreases outlined below are mainly a reflection of the Company's efforts to control costs. The Company added several new personnel by converting consultants who previously provided development services related to the business model and the Company's entry into new market verticals to staff. This was offset by an overall reduction in the use of consultants. Additionally, there was a reduction in (i) relocation and hiring expenses, (ii) reduced legal expense connected with financing, registration filings, acquisitions and the wind up of litigation in the World Capital lawsuit and the SSJ litigation, (iii) accounting expense related to acquisitions and reviews of SEC filings, (iv) finance fees associated with the convertible debentures and the now cancelled Standby Equity Distribution Agreement, (v) employee stock bonuses, and (vi) additional travel and entertainment expense connected with sales efforts to secure new installation opportunities. Employment related expense for the nine

month period ended September 30, 2005 was higher than the same period in 2006 because in 2005, the Company relocated several key members of its management team and was required to provide temporary living expenses related to these moves. Management expects general and administrative expenses in future periods to run at similarly decreased levels as the Company works to effectively manage the costs of the business even as it pursues continued growth.



<PAGE>

<TABLE>
<CAPTION>

Quarterly increases (decreases) in selling, general and administrative

| <S> | For the three months ended September 30, 2006 as compared to September 30, 2005 <C> | For the nine months ended September 30, 2006 as compared to September 30, 2005 <C> |
|---|---|---|
| Payroll | $ (73,936) | $ 44,041 |
| Consulting | (143,587) | (351,484) |
| Legal | (81,763) | (184,446) |
| Accounting | 28,736 | 71,259 |
| Finance Fees | 2,520 | (50,468) |
| Insurance | 27,800 | 74,946 |
| Employment related expense | 0 | (303,818) |
| Travel & Entertainment | (138,511) | (397,631) |
| Other | 7,526 | 40,781 |
| Increase Quarter and YTD | $ ( 371,215) | $ ( 1,056,820) |

</TABLE>

Interest Expense

Interest expense consists of interest accrued on loans and convertible notes payable, and the beneficial conversion feature on the convertible notes and warrants.

Interest expense decreased by $2,042,864 to $279,156 for the three months ended September 30, 2006 as compared to $2,322,020 for the three months ended September 30, 2005.

Interest expense decreased by $2,796,441 to $827,461 for the nine months ended September 30, 2006 as compared to $3,623,902 for the nine months ended September 30, 2005.

The decrease for the three month and nine month periods is attributable to a reduction in beneficial conversion feature recorded on convertible debentures issued in the prior year. The calculation of beneficial conversion feature has been superseded by the Derivative Liability computation identified in the `Other Expense' section below and in Footnote 11.

Other Expense

The Company recorded income of $421,496 for the three months ended September 30, 2006 and $1,641,007 for the nine months ended September 30, 2006 as the "mark to market" adjustment of the derivative liability. There was no similar expense during the same periods in 2005.

Net Loss

For the three months ended September 30, 2006, the Company had a loss of $798,526 as compared to a loss of $3,215,847 for the three months ended September 30, 2005 a decrease of $2,417,321 or 75%.

For the nine months ended September 30, 2006, the Company had a loss of $2,283,244 as compared to a loss of $6,829,055 for the nine months ended September 30, 2005 a decrease of $4,545,811 or 67%.

The significant difference for the quarter and year to date as compared to the same period last year is mainly due to the reduction in selling, general and administrative costs and the adjustment of the derivative instrument liability in the first six months offset by an increase in depreciation and amortization expense.



<PAGE>

Income Taxes

No provision for federal and state income taxes has been recorded as the Company incurred net operating losses since January 1, 1998 (Inception). The net operating losses will be available to offset any future taxable income. Given the Company's limited operating history, losses incurred to date and the difficulty in accurately forecasting future results, management does not believe that the realization of the potential future benefits of these carry forwards

meets the criteria for recognition of a deferred tax asset required by generally accepted accounting principles. Accordingly, a full 100% valuation allowance has been provided.

Liquidity and Capital Resources

Cash and cash equivalents were $30,820 at September 30, 2006. Net cash used in operating activities of $942,455 was derived from the net loss from operations offset by depreciation of equipment, amortization of intangibles and deferred financing costs, an increase in accounts receivable, an increase in inventory, an increase in prepaid expenses and deposits, and an increase in accounts payable, payroll taxes, and accrued expenses.

At September 30, 2006, the Company had a working capital deficit of $6,695,766. The Company made capital expenditures of $43,313 during the nine months ended September 30, 2006.

From July 2006 through September 2006, the Company issued short term bridge notes totaling $48,000 to Seaport Capital. The notes carried interest at a rate of between 10% and 15% per annum. During the same period, the Company repaid $5,000 to Seaport Capital consisting of the bridge notes secured between April and September, 2006.

In August 2006, the Company issued a two year convertible debenture to Michael Vickers, an accredited investor, in the principal amount of $50,000. The debenture is convertible at a fixed price of $0.0058 per share. The debenture carries interest at a rate of 9% per annum. In addition, the Company issued 8,620,689 two year warrants to purchase common shares; one third at a price of $0.02 per share, one third at a price $0.05 per share, and one third at a price of $0.08 per share. The warrants are subject to a call provision by the Company if the market price per share is above $0.05 per share, $0.08 per share, and $0.11 per share respectively for a period of 5 or more days.

In August 2006, the Company issued a two year convertible debenture to Betsill Builders, an accredited investor, in the principal amount of $250,000. The debenture is convertible at a fixed price of $0.0066 per share. The debenture carries interest at a rate of 9% per annum. In addition, the Company issued 40,000,000 two year warrants to purchase common shares; one third at a price of $0.02 per share, one third at a price $0.05 per share, and one third at a price of $0.08 per share. The warrants are subject to a call provision by the Company if the market price per share is above $0.05 per share, $0.08 per share, and $0.11 per share respectively for a period of 5 or more days.

From April 2006 through June 2006, the Company issued short term bridge notes totaling $27,911 to Seaport Capital. The notes carried interest at a rate of between 10% and 15% per annum.

In April 2006, the Company received $50,000 from the sale of a term note to an accredited investor. The note is due on June 1, 2006 and carries interest at a rate of 12% per annum. In addition, the investor received a two year warrant to purchase 555,555 shares of common stock at an exercise price of $0.045 per share. Pursuant to the penalty provision, the Investor will receive an additional 2,222,220 common stock warrants since the Company failed to pay the principal and accrued interest on the stated maturity date.

On April 18, 2006, the Company issued 1,000,000 shares of restricted common stock on conversion of warrants. The shares were issued at an average price of $0.01 per share.

On April 19, 2006, the Company sold 15,252,976 shares of restricted common stock for a total of $150,000. The shares were issued at an average price of $0.098 per share.

On June 15, 2006, the Company sold 3,731,343 shares of restricted common stock for a total of $25,000. The shares were issued at an average price of $.0067 per share.

On June 26, 2006, the Company sold 5,411,255 shares of Series B Preferred Stock for a total of $250,000. The series B preferred shares are convertible under certain conditions into 10 shares of common stock. If the preferred shares are converted into common shares, it would be at an average price of $0.0046 per share.



<PAGE>

In February 2006, the Company issued a two year, secured convertible debenture to Cornell in the aggregate amount of $125,000. The debenture carries similar conversion provisions as the November 2, 2005 and December 16, 2005 debentures. In addition, the Company issued 25,000,000 warrants to purchase common shares at a price of $0.01 per share, and 25,000,000 warrants to purchase common shares at a price of $0.03 per share. The warrants carry three year expirations.

From January 2006 through March 2006, the Company issued short term bridge notes totaling $60,712 to Seaport Capital. The notes carried interest at a rate of between 10% and 15% per annum. During the same period, the Company repaid $77,712 to Seaport Capital consisting of the bridge notes secured between January and March, 2006 and a previous bridge note issued in December 2005.

On February 22, 2006, the Company sold 2,659,574 shares of restricted common stock to an accredited investor for a total of $50,000. The shares were issued at an average price of $0.0188 per share.

On March 24, 2006, the Company sold 13,333,333 shares of restricted common stock to accredited investors for a total of $80,000. The shares were issued at an average price of $0.006 per share.

In January 2006, the Company issued 3,572,851 shares of restricted common stock upon conversion of $104,327.24 of the November 2006 secured convertible debenture to Cornell. The shares were converted at a price of $0.0292 per share.

In February 2006, the Company issued 1,760,563 shares of common stock upon conversion of $50,000 of the November 2006 secured convertible debenture to Cornell. The shares were converted at a price of $0.0284 per share.

In March 2006, the Company issued 2,183,000 shares of common stock upon conversion of $55,448.20 of the November 2006 secured convertible debenture to Cornell. The shares were converted at a price of $0.0254 per share.

In June 2006, the Company issued 7,180,222 shares of common stock upon conversion of $77,552 of the November 2006 secured convertible debenture to Cornell. The shares were converted at a price of $0.0108 per share.

In June 2006, the Company issued 14,925,374 shares of common stock upon conversion of $100,000 of the November 2006 secured convertible debenture to Cornell. The shares were converted at a price of $0.0067 per share.

In July 2006, the Company issued 7,692,308 shares of common stock upon conversion of $50,000 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0065 per share.

In August 2006, the Company issued 16,101,695 shares of common stock upon conversion of $95,000 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0059 per share.

In August 2006, the Company issued 16,000,000 shares of common stock upon conversion of $80,000 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0050 per share.

In September 2006, the Company issued 12,195,122 shares of common stock upon conversion of $50,000 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0041 per share.

The Company has satisfied its cash requirements to date primarily through private placements of common stock, warrants, debentures convertible into shares of common stock, promissory notes, and the issuance of common stock in lieu of payment for services. Also, officers have at times loaned the Company funds to provide working capital.

The Company needs to raise a minimum of $3,500,000 through public or private debt, sale of equity, to continue expanding our broadband on demand managed services and service operation center, and to develop and implement additional contracts at airports, hotels and retail locations in order to continue expanding our Wi-Fi networks in strategic high traffic locations. Such financing may not be available when needed. Even if such financing is available, it may be on terms that are materially adverse to your interests with respect to dilution of book value, dividend preferences, liquidation preferences, or other terms. If we are unable to obtain financing on reasonable terms, we could be forced to delay, scale back or eliminate certain product and service development programs. In addition, such inability to obtain financing on reasonable terms could have a material adverse effect on our business, operating results, or financial condition.



<PAGE>

The report of our independent auditors on our financial statements for the years ended December 31, 2005 and 2004 contains an explanatory paragraph, which indicates that we have incurred losses and have a working capital deficiency. This report raises substantial doubt about our ability to continue as a going concern. This report is not viewed favorably by analysts or investors and may make it more difficult for us to raise additional debt or equity financing needed to run our business.

Subsequent Events

In October 2006, the Company received $100,000 from the sale of convertible debentures to accredited investors. The convertible debentures mature in two years, carry interest at a rate of 9% per annum, and are convertible at an average price of $0.0040 per share.

In October 2006, the Company received $10,000 from the sale of a short term demand note to an accredited investor.

In November 2006, the Company received $25,000 from the sale of a short term demand note to an accredited investor.

Item 3. - Controls and Procedures

(A) Evaluation of Disclosure Controls and Procedures
As of the end of the period covered by this report, the Company carried out an evaluation, under the supervision and with the participation of the Company's Principal Executive Officer and Principal Financial Officer of the effectiveness of the design and operation of the Company's disclosure controls and procedures. The Company's disclosure controls and procedures are designed to provide a reasonable level of assurance of achieving the Company's disclosure control objectives. The Company's Principal Executive Officer and Principal Financial Officer have concluded that the Company's disclosure controls and procedures are, in fact, effective at this reasonable assurance level. In addition, the Company reviewed its internal controls, and there have been no significant changes in its internal controls or in other factors that could significantly affect those controls subsequent to the date of their last valuation or from the end of the reporting period to the date of this Form 10-QSB.

(B) Changes in Internal Controls over Financial Reporting
In connection with the evaluation of the Company's internal controls during the quarter ended September 30, 2005, the Company's Principal Executive Officer and Principal Financial Officer have determined that there are no changes to the Company's internal controls over financial reporting that have materially affected, or is reasonably likely to materially effect, the Company's internal controls over financial reporting.



<PAGE>

PART II - OTHER INFORMATION

Item 2. Changes in Securities

During the three months ended September 30, 2006, the Company issued the following unregistered securities:

In July 2006, the Company issued 7,692,308 shares of common stock upon conversion of $50,000 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0065 per share.

In August 2006, the Company issued 16,101,695 shares of common stock upon conversion of $95,000 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0059 per share.

In August 2006, the Company issued 16,000,000 shares of common stock upon conversion of $80,000 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0050 per share.

In September 2006, the Company issued 12,195,122 shares of common stock upon conversion of $50,000 of the November 2006 secured convertible debenture to Cornell Capital. The shares were converted at a price of $0.0041 per share.

In August 2006, the Company issued a two year convertible debenture to Michael Vickers, an accredited investor, in the principal amount of $50,000. The debenture is convertible at a fixed price of $0.0058 per share. The debenture carries interest at a rate of 9% per annum. In addition, the Company issued 8,620,689 two year warrants to purchase common shares; one third at a price of $0.02 per share, one third at a price $0.05 per share, and one third at a price of $0.08 per share. The warrants are subject to a call provision by the Company if the market price per share is above $0.05 per share, $0.08 per share, and $0.11 per share respectively for a period of 5 or more days.

In August 2006, the Company issued a two year convertible debenture to Betsill Builders, an accredited investor, in the principal amount of $250,000. The debenture is convertible at a fixed price of $0.0066 per share. The debenture carries interest at a rate of 9% per annum. In addition, the Company issued 40,000,000 two year warrants to purchase common shares; one third at a price of $0.02 per share, one third at a price $0.05 per share, and one third at a price of $0.08 per share. The warrants are subject to a call provision by the Company if the market price per share is above $0.05 per share, $0.08 per share, and $0.11 per share respectively for a period of 5 or more days.

Item 3. Default on Senior Securities

On May 4, 2005, the Company entered into a Master Lease Agreement with Agility Lease Fund I, LLC. Under the terms of the agreement, the Company can lease up to $1.0 million of equipment and project costs related to Wi-Fi network growth and deployments. In connection with the Master Lease Agreement, the Company is required to issue $200,000 of warrants at the market price on the day prior to closing, and an additional 10% warrant based on the market price on the day prior to each lease schedules execution.

In May and June 2005, the Company utilized $529,234 of the lease line, and recorded $96,408 of prepaid interest. The three lease schedules are due in May and June 2008.

In July and August 2005, the Company utilized $[illegible] of the lease line, and recorded $52,621 of prepaid interest. The two lease schedules are due in July and August 2008.

In connection with the lease agreement and the individual lease draws, the Company issued 4,245,133 three year warrants at prices between $0.056 and $0.06 per share. In connection with the July and August lease draws, the Company issued 204,955 three year warrants at a price of $0.051 per share, and 170,535 three year warrants at a price of $0.059 per share.

In April 2006, the Company defaulted on its payments under the Master Lease Agreement. Agility has invoked their right to directly collect the proceeds of the revenue generated by the leased locations. The Company cooperated in this effort and in September 2006 came to agreement with Agility to re-age the delinquent lease payments. Agility continues to maintain control of the proceeds to maintain timely payment of the leases.



<PAGE>

Item 6. Exhibits

a) Exhibits

<TABLE>
<CAPTION>

| Exhibit No. | Description | Location |
|---|---|---|
| <S> | | <C> |
| 3.1 | Articles of Incorporation | Incorporated by reference to Exhibit 3.1 in the Registration Statement on Form 10-K filed with the Securities and Exchange Commission on November 30, 2000 |
| 3.2 | Articles of Amendment dated March 14, 1985 | Incorporated by reference to Exhibit 3.2 in the Registration Statement on Form SB-2 filed with the Securities and Exchange Commission on November 30, 2000 |
| 3.3 | Articles of Amendment dated August 25, 2000 | Incorporated by reference to Exhibit 3.3 in the Registration Statement on Form SB-2 filed with the Securities and Exchange Commission on November 30, 2000 |
| 3.4 | Articles of Amendment dated February 10, 2005 | Incorporated by reference to Exhibit 2.1 on Form 10-K filed with the Securities and Exchange Commission on March 25, 2005 |
| 3.5 | Bylaws | Incorporated by reference to Exhibit 3.4 in the Registration Statement on Form SB-2 filed with the Securities and Exchange Commission on November 30, 2000 |
| 10.2 | Master Lease Agreement #5509 with Agility Lease fund I, LLC. | Incorporated by reference to Exhibit 99.1 to ICOA's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 22, 2005 |
| 10.3 | Form of Warrant to be issued to Agility Solutions | Incorporated by reference to Exhibit 99.2 to ICOA's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 22, 2005 |
| 10.4 | Amended and Restated Settlement Agreement with Richard Schiffmann | Incorporated by reference to Exhibit 99.4 to ICOA's Current Report on Form 8-K filed with the Securities and Exchange Commission on June 26, 2006 |
| 10.5 | Amended and Restated Settlement Agreement with Stephen N. Cummings | Incorporated by reference to Exhibit 99.5 to ICOA's Current Report on Form 8-K filed with the Securities and Exchange Commission on June 26, 2006 |
| 21.1 | Subsidiaries of ICOA | Incorporated by reference to Exhibit 21.1 in the Registration Statement on Form SB-2 filed with the Securities and Exchange Commission on November 30, 2000 |
| 31.1 | Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | Provided herewith |
| 31.2 | Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | Provided herewith |
| 32.1 | Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | Provided herewith |
| 32.2 | Certification pursuant to Section 906 of the | |

Case 1:07-cv-00089-SDM Document 1-9 Filed 05/18/2007 Page 23 of 26

Sarbanes-Oxley Act of 2002 ... Provided herewith

</TABLE>



<PAGE>

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned duly authorized.

Date: November 22, 2006

ICOA, INC.

/s/ George Strouthopoulos
------------------------
George Strouthopoulos
Chief Executive Officer

/s/ Erwin Vahlsing, Jr.
------------------------
Erwin Vahlsing, Jr.
Chief Financial Officer

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-31.1
<SEQUENCE>2
<FILENAME>ex311.txt
<DESCRIPTION>SECTION 302 CERTIFICATION
<TEXT>

EXHIBIT 31.1

OFFICER'S CERTIFICATE
PURSUANT TO SECTION 302*

I, George Strouthopoulos, Chief Executive Officer, certify that:

1. I have reviewed this form 10-QSB for the quarter ended September 30, 2006 of ICOA, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small business issuer and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Omitted;

(c) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the

small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer(s) and I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

| | | | |
|---|---|---|---|
| Date: | November 22, 2006 | By: | /s/ George Strouthopoulos |
| | | Name: | George Strouthopoulos |
| | | Title: | Chief Executive Officer |

*The introductory portion of paragraph 4 of the Section 302 certification that refers to the certifying officers' responsibility for establishing and maintaining internal control over financial reporting for the company, as well as paragraph 4(b), have been omitted in accordance with Release No. 33-8545 (March 2, 2005) because the compliance period has been extended for small business issuers until the first fiscal year ending on or after July 15, 2006.

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-31.2
<SEQUENCE>3
<FILENAME>ex312.txt
<DESCRIPTION>SECTION 302 CERTIFICATION
<TEXT>

EXHIBIT 31.2

OFFICER'S CERTIFICATE
PURSUANT TO SECTION 302*

I, Erwin Vahlsing, Jr., Chief Financial Officer, certify that:

1. I have reviewed this form 10-QSB for the quarter ended September 30, 2006 of ICOA, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the small business issuer as of, and for, the periods presented in this report;

4. The small business issuer's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the small business issuer and have:

(a) Designed such disclosure controls and procedures, or

caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Omitted;

(c) Evaluated the effectiveness of the small business issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the small business issuer's internal control over financial reporting that occurred during the small business issuer's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the small business issuer's internal control over financial reporting; and

5. The small business issuer's other certifying officer(s) and I have disclosed, based on my most recent evaluation of internal control over financial reporting, to the small business issuer's auditors and the audit committee of the small business issuer's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the small business issuer's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date: November 22, 2006 By: /s/ Erwin Vahlsing, Jr.

Name: Erwin Vahlsing, Jr.
Title: Chief Financial Officer

*The introductory portion of paragraph 4 of the Section 302 certification that refers to the certifying officers' responsibility for establishing and maintaining internal control over financial reporting for the company, as well as paragraph 4(b), have been omitted in accordance with Release No. 33-8545 (March 2, 2005) because the compliance period has been extended for small business issuers until the first fiscal year ending on or after July 15, 2006.

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-32.1
<SEQUENCE>4
<FILENAME>ex321.txt
<DESCRIPTION>SECTION 906 CERTIFICATION
<TEXT>

EXHIBIT 32.1

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of ICOA, Inc. (the "Company") on Form 10-QSB for the quarter ended September 30, 2006 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, in the capacities and on the dates indicated below, hereby certifies pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to his knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operation of the Company.

Date November 22, 2006 By: /s/ George Strouthopoulos

Name: George Strouthopoulos
Title: Chief Executive Officer

A signed original of this written statement required by Section 906, or other document authentications, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided Sherb & Co., LP and will be retained by ICOA, Inc., and furnished to the Securities and Exchange Commission or its staff upon request.

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-32.2
<SEQUENCE>5
<FILENAME>ex322.txt
<DESCRIPTION>SECTION 906 CERTIFICATION
<TEXT>

EXHIBIT 32.2

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of ICOA, Inc. (the "Company") on Form 10-QSB for the quarter ended September 30, 2006 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, in the capacities and on the dates indicated below, hereby certifies pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to his knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operation of the Company.

Date November 22, 2006 By: /s/ Erwin Vahlsing, Jr.
-----------------------------
Name: Erwin Vahlsing, Jr.
Title: Chief Financial Officer

A signed original of this written statement required by Section 906, or other document authentications, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided Sherb & co., LP and will be retained by ICOA, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----